

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-28-1997

# United States v. McBroom

Precedential or Non-Precedential:

Docket
96-5719

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. McBroom" (1997). *1997 Decisions*. Paper 211.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/211

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 28, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5719

UNITED STATES OF AMERICA

v.

KENNETH MCBROOM,

        Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim. No. 95-cr-00502)

Argued
June 12, 1997

Before: MANSMANN, NYGAARD and ROSENN,
Circuit Judges.

(Filed August 28, 1997)

        Faith S. Hochberg, Esquire
        Kevin McNulty, Esquire
        Barry S. Pollack, Esquire
          (ARGUED)
        Office of the United States Attorney
        970 Broad Street
        Room 502
        Newark, New Jersey 07102

          COUNSEL FOR APPELLEE



        Lawrence S. Lustberg, Esquire
          (ARGUED)
        Mark A. Berman, Esquire
        Crummy, Del Deo, Dolan,
         Griffinger & Vecchione
        One Riverfront Plaza
        Newark, New Jersey 07102-5497

        Of Counsel:

        Matthew P. Boylan, Esquire
        Lowenstein, Sandler, Kohl,

Fisher & Boylan
65 Livingston Avenue
Roseland, New Jersey 07068

COUNSEL FOR APPELLANT

OPINION OF THE COURT

MANSMANN, Circuit Judge.

Kenneth McBroom pled guilty to and was convicted of one count of possession of child pornography in violation of 18 U.S.C. S 2252(a)(4). McBroom moved the district court for a downward departure pursuant to U.S. Sentencing Guideline S 5K2.13 (policy statement) on the ground that he suffered from a significantly reduced mental capacity. Finding that McBroom was able, at the time of the offense, to absorb information in the usual way and to exercise the power of reason, the district court concluded that McBroom was ineligible for a downward departure.

We believe that the district court could have considered the possibility that McBroom suffered from a volitional impairment which prevented him from controlling his behavior or conforming it to the law. We will, therefore, vacate McBroom's sentence and remand for resentencing so that the district court may consider this possibility in the first instance.

2

I.

As a child, McBroom suffered years of sexual abuse at the hands of his father. As an adult, McBroom abused alcohol and drugs, and he viewed vast amounts of pornography. McBroom contends that the abuse he endured as a child caused him to suffer from a significantly reduced mental capacity such that he felt compelled to possess child pornography he downloaded from the Internet -- despite his ability to process information, to reason, and to understand the difference between right and wrong.

McBroom detailed his abusive childhood in an uncontradicted affidavit submitted to the district court:

>     All outward appearances of my family were positive
>     but deceiving. . . .
>
>     I do not know when the sexual abuse began. I have
>     vague recollections of being a young boy and having
>     him bathe me, and sensing his spending what seemed

to be an inordinate amount of time washing my penis. I suppose I was four or five at the time.

I have clear memories of the abuse from about the age of ten onward. . . . Two or three times a week, after we had gone to bed, my father . . . would come to my bed, sit on the edge, and begin rubbing my back or chest. He would soon find his way to my penis. He would pull my pajamas off, fondle me for a while, and then start performing oral sex. On occasion he would take my hand and put it on his penis and tell me to rub it. . . .

The sexual abuse did not occur exclusively in the evenings. It also took place on occasions when my father and I happened to be alone in the house during the day. It also occurred on a regular basis when my father would take me on one of his frequent business trips. . . .

There were also a few instances in which my father took Polaroid pictures of me naked. . . .

This routine continued for about five years, until I was 15 years old.

3

McBroom Aff., PP 3-9.

While attending college in New Orleans, McBroom began to "develop an interest in pornography," and he would "go to peep shows and pornography shops in downtown New Orleans." Id. at P 15. McBroom also began to drink excessively. After graduation, McBroom attended law school and was married. While in law school, McBroom drank every day, and he "developed an affinity for cocaine." He also continued to "visit" peep shows and pornography shops. Id. at P 18.

During McBroom's first year in law school, he was asked to testify at his father's trial on charges that his father sexually molested a neighbor's son. Because he remembered seeing his father with the boy on many occasions, McBroom firmly believed that his father was guilty. Nonetheless, McBroom testified that he had a healthy relationship with his father, and he did not reveal the sexual abuse he had endured. McBroom's father was acquitted. McBroom's experience on the witness stand filled him with "shame and disgust," and he continues to express concern and remorse for the alleged victim of his father's abuse. Id. at PP 19-20.

After he graduated from law school, McBroom and his wife moved to New Jersey, where they had a son. McBroom clerked for a judge for one year and began working as an associate at a law firm in Roseland, New Jersey. At least once per week, McBroom stopped at peep shows in Newark on his way home from work. McBroom developed an after-work routine whereby he would purchase and consume a six-pack of beer and go to the peep shows before returning home. Id. at PP 21-23.

McBroom began using cocaine, and he was soon spending in excess of $300 per week on drugs. Without his wife's knowledge, McBroom acquired several credit cards to fund his cocaine and alcohol purchases. McBroom was unable to repay the balances of these credit cards, however, and three banks have obtained judgments against him. Id. at P 24.

McBroom and his wife had a second son. In 1983, McBroom's wife discovered cocaine and receipts from credit

4

card cash advances in McBroom's briefcase. The McBrooms began seeing a therapist. In 1984, McBroom disclosed to the therapist that his father had sexually abused him. This was the first time McBroom disclosed the abuse he had suffered. That day, McBroom told his wife about the abuse. McBroom did not reveal his "fascination" with peep shows and pornography, however, and he continued to go to peep shows, view pornography, and abuse alcohol and cocaine throughout his therapy. Id. at PP 29-31.

Although the Roseland law firm was "very pleased" with the quality of McBroom's work, McBroom left the firm and began working for a firm in Jersey City. During this time, McBroom's wife asked him to leave, and the McBrooms separated. McBroom subsequently moved in with another woman. He then left the Jersey City law firm and entered an inpatient alcohol and drug treatment program. Id. at PP 32-33.

McBroom remained sober for five months, but he began drinking again, and soon he "was back to where [he] had been." McBroom's wife divorced him. During this time, McBroom was able to work on a per diem basis for other attorneys. McBroom "never received any complaints from any of the attorneys for whom [he] did this work, and in fact was being asked to handle an increasingly large volume and variety of matters including closings, motions, depositions, brief-writing and actual trial work." Id. at P 34.

In 1989, McBroom began working for a law firm in Englewood Cliffs, New Jersey. Soon thereafter, McBroom admitted himself into a rehabilitation program. That program was unsuccessful, however, and McBroom began to use cocaine and alcohol once again. Throughout this period, McBroom continued to visit peep shows and pornography stores in Newark; he also began to visit similar facilities in New York City. Id. at P 35.

McBroom's father died in 1990. Prior to his death, McBroom's father apologized to McBroom "for what he had done." McBroom's father then revealed to McBroom's mother what had occurred, and he disclosed that he had also been sexually abused as a child. Id. at P 36.

In early 1991, McBroom moved into his own apartment. McBroom began to consume "massive amounts of alcohol and cocaine." In addition to continued visits to the peep shows, McBroom began purchasing "all sorts of pornography magazines." He also "developed an interest in phone sex," and his telephone bill for one two-month period exceeded $650, a bill McBroom paid with money he borrowed from his mother. Id. at P 38.

McBroom entered his third rehabilitation program in 1991. Although McBroom began drinking alcohol shortly after leaving this program, he has not used cocaine since that time. McBroom remained with the Englewood Cliffs law firm for three years. McBroom "handled a case load of approximately 65 active litigation files [and] had approximately seven or eight completed jury trials during this period." Id. at 39-42.

McBroom left the Englewood Cliffs firm in 1992, "determined to make it on [his] own" as a sole practitioner. Unfortunately, with no one to account to either at home or at work, McBroom "drank [him]self into oblivion." McBroom also began to engage in self-mutilation. He would often place lit cigarettes on the back of his hand, and on one occasion he cut through the skin and muscle of his left forearm and right hand with a razor blade. In addition, McBroom was hospitalized on six separate occasions with acute alcohol-induced pancreatitis. Id. at 43-46.

McBroom entered his fourth rehabilitation program in 1993. McBroom got drunk on the day after his release from that program. On December 28, 1993, a female acquaintance took McBroom to a meeting of Alcoholics Anonymous. McBroom has been sober since that first

meeting; McBroom attends at least one Alcoholics Anonymous meeting every day, and he also attends many "Lawyers Concerned for Lawyers" meetings. Id. at PP 47-49.

McBroom began a romantic relationship with the woman who brought McBroom to the Alcoholics Anonymous meeting. In 1994, McBroom gave up his apartment and moved in with the woman. At the time of his move, McBroom threw away all of the pornography magazines which he had accumulated. McBroom "no longer had the

6

imperious urge to visit peep shows or to stare for hours at pornography magazines." Id. at P 50.

In late 1994, McBroom purchased a personal computer for the apartment to be used in his work as a sole practitioner. McBroom "soon discovered the Internet," and in a short time he "discovered the wealth of pornography available on the Internet." "Amaze[d] at the volume of available material," McBroom discovered "pornography of types [he] had never before seen . . . includ[ing] child pornography, bestiality, masochism, bondage and every imaginable sexual fetish." Id. at PP 51-53.

For McBroom, "[t]he amazement turned to fascination, and ultimately to obsession." According to McBroom, "[e]very time I turned the computer on there were hundreds of new pictures depicting all sorts of pornography. . . . When I wasn't sitting at the computer looking at this stuff, I was thinking about looking at it. I thought nothing of spending three consecutive hours at the computer at a single sitting." Approximately twenty-five percent of the images McBroom received constituted child pornography. Id. at PP 54-56.

About one month before the Federal Bureau of Investigation executed the search warrant that led to the sentence that is the subject of this appeal, McBroom learned that the Bureau was investigating his activity. Despite this awareness, McBroom continued to view this material and to store it on his computer's hard drive. Id. at PP 57-58.

II.

A.

On September 22, 1995, a federal grand jury sitting in Newark, New Jersey, returned a three-count indictment charging McBroom with one count of knowingly

transporting child pornography in violation of 18 U.S.C.
S 2252(a)(1), one count of knowingly receiving child
pornography in violation of 18 U.S.C. S 2252(a)(2), and one
count of knowingly possessing child pornography in

violation of 18 U.S.C. S 2252(a)(4). On April 22, 1996,
pursuant to a written plea agreement, McBroom pled guilty
to count three.1

The district court had jurisdiction pursuant to 18 U.S.C.
S 3231. At sentencing, the district court noted that under
the Sentencing Guidelines, the crime of possession of
materials depicting a minor engaged in sexually explicit
conduct has a base offense level of thirteen. U.S.
Sentencing Guidelines Manual S 2G2.4(a) (1995).2 Because
the material involved a prepubescent minor or a minor
under the age of twelve, section 2G2.4(b)(1) provided for an
increase of two levels.3 Pursuant to section 3E1.1(a), the
district court granted a two-point downward adjustment for
acceptance of responsibility. The total offense level was
therefore thirteen.

The district court found that McBroom had a total of two
criminal history points based on three separate convictions
for driving while intoxicated. U.S.S.G. S 4A1.1(c) (one of the

_____

1. Following entry of the plea, McBroom gave notice to the New Jersey
Office of Attorney Ethics as required by New Jersey Court Rules.
McBroom agreed to surrender temporarily his license to practice law
pending resolution of his fitness to practice law by the New Jersey
Supreme Court, and he obtained non-legal work for a newspaper.
McBroom Aff., at PP 73-74.

2. Effective November 1, 1996, this crime has a base offense level of
fifteen. See U.S.S.G. S 2G2.4(a) (rev. supp. May 1, 1997).

3. The presentence report recommended an additional two-point upward
adjustment pursuant to section 2G2.4(b)(2), but the United States did
not seek this adjustment at sentencing and the district court accepted
McBroom's objection to the applicability of that section.

Section 2G2.4(b)(2) applies when the offense involves possession of ten
or more books, magazines, periodicals, films, videotapes, or other items
containing a visual depiction involving the sexual exploitation of a
minor.
McBroom possessed ten to twenty files on his computer's hard drive, and
each file contained one image of child pornography. Finding that section
2G2.4(b)(2) did not provide guidance on how to count images in
computer files on a single computer hard drive, the district court

declined to enhance McBroom's offense level pursuant to that section. Effective November 1, 1996, an increase of two levels is provided where the defendant's possession of the material resulted from the defendant's use of a computer. U.S.S.G. S 2G2.4(b)(3) (rev. supp. May 1, 1997).

convictions was not counted pursuant to U.S.S.G. S 4A1.2(e)). McBroom's criminal history category was therefore II. U.S.S.G. Ch. 5, Pt. A. For a total offense level of thirteen and a criminal history category of II, the Sentencing Guidelines provide for a sentence offifteen to twenty-one months in prison. Id.

B.

1.

A district court may depart from the sentence established by the applicable guideline if the court finds that there exists "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. S 3553(b); U.S.S.G.S 5K2.0, p.s. In determining whether a circumstance was adequately taken into consideration, the sentencing court shall consider "only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. S 3553(b).

In subpart 5K2 of the guidelines, the Commission identifies some of the factors that it did not take into account fully in formulating the guidelines. U.S.S.G. S 5K2.0, p.s. Some of these factors recognize that an upward departure may be warranted in certain circumstances, see, e.g., U.S.S.G. S 5K2.7, p.s. (upward departure may be warranted where the defendant's conduct resulted in the significant disruption of a governmental function), while other factors recognize that a downward departure may sometimes be justified, see, e.g., U.S.S.G. S 5K2.10, p.s. (downward departure may be warranted where the victim's wrongful conduct contributed significantly to provoking the offense behavior). The factors contained in subpart 5K2 are the so-called "encouraged factors." If a potential departure factor is an encouraged factor, the sentencing court is authorized to depart if the

applicable guideline does not already take it into account. Koon v. United States, 116 S.Ct. 2035, 2045 (1996).4

In contrast, some characteristics are "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." U.S.S.G. Ch. 5, Pt. H, intro. comment. These so-called "discouraged factors" include age, education and vocational skills, and physical condition. U.S.S.G. Ch. 5, Pt. H. If a potential departure factor is a discouraged factor, or an encouraged factor already taken into account by the applicable guideline, the court should depart "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." Koon, 116 S.Ct. at 2045. Finally, certain "forbidden factors" are not relevant in the determination of a sentence and may not be considered by the sentencing court. Id. These factors include race, sex, and national origin. U.S.S.G. S 5H1.10, p.s.5

With limited exceptions, mental and emotional conditions are discouraged factors; that is, they are not ordinarily relevant in determining whether a departure is warranted. U.S.S.G. S 5H1.3, p.s. The exceptions to this general rule are contained in the encouraged factors of subpart 5K2 of the guidelines. Of particular relevance to this case, section 5K2.13 provides:

_____

4. An encouraged factor is not an appropriate basis for departure when the applicable guideline has taken the encouraged factor into account. For example, an upward departure for disruption of a governmental function, U.S.S.G. S 5K2.7, p.s., "ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense." Id. Where the applicable guidelines do take the encouraged factor into account, departure is warranted "only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. S 5K2.0, p.s.

5. If a proposed departure factor is not mentioned in the guidelines, the sentencing court "must, taking into consideration the structure and theory of both relevant individual guidelines and the guidelines taken as a whole, determine whether the circumstances presented are sufficient to remove the case from the heartland of the applicable guideline." United States v. Sally, 116 F.3d 76, 80 (3d Cir. 1997) (quoting United States v. Brock, 108 F.3d 31, 35 (4th Cir. 1997)).

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity

not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. S 5K2.13, p.s. Section 5K2.13 is an encouraged departure. United States v. Askari, No. 95-1662, 1997 WL 92051, *5 (3d Cir. March 5, 1997) (Becker, J., concurring), reh'g en banc granted, opinion vacated, 1997 WL 92051, *6 (March 27, 1997); see also United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993) ("The individual guidelines do not take into account, for example, of an offender's`diminished capacity,' which circumstance, in the Commission's view would normally warrant a downward departure."). Thus, while mental and emotional conditions are not ordinarily relevant in determining whether a downward departure is warranted, one suffering from a "significantly reduced mental capacity" may be eligible for such a departure.

2.

McBroom moved the district court for a downward departure based on, among other things, his claim pursuant to section 5K2.13 that he suffered from a significantly reduced mental capacity due to the sexual abuse he had endured as a child, and that this reduced capacity compelled him to possess child pornography.6

_____

6. The encouraged factor of section 5K2.13 is not taken into account by the guideline provisions applicable to this case, and so the district court
was authorized to depart if it found that McBroom satisfied the requirements of section 5K2.13. Koon, 116 S.Ct. at 2045.

McBroom also sought a downward departure on the grounds that (1) his criminal history category of two overstated the seriousness of his past criminal conduct and the likelihood that he would commit other crimes; and (2) mitigating circumstances existed due to recently renewed family ties. The district court rejected both of these grounds for McBroom's request, and McBroom does not contest these rulings on appeal.

11

Before a district court may exercise its discretion to depart pursuant to section 5K2.13, a defendant must prove, among other things, that (1) the offense is"non-violent" and (2) a significantly reduced mental capacity contributed to commission of the offense. United States v.

Rosen, 896 F.2d 789, 791 (3d Cir. 1990); United States v. McDowell, 888 F.2d 285, 291 (3d Cir. 1989) (defendant usually bears burden of persuasion when attempting to justify downward departure). The defendant must prove these elements by a preponderance of the evidence. See McDowell, 888 F.2d at 291.

The district court concluded without discussion that "it is clear that [McBroom] committed a crime that is non-violent." Slip. Op. at 7-8. The court then turned to the issue of whether McBroom suffered from a significantly reduced mental capacity which contributed to the commission of the offense.

In support of his motion, McBroom submitted the affidavit we cited extensively above as well as letters from three medical professionals. After his arrest, McBroom began to see psychotherapist Edward Crowley on a regular basis. McBroom was also referred to Dr. Richard Gartner, a clinical psychologist, and Dr. Ronald Winchel, a licensed psychiatrist and psychopharmacologist. McBroom Aff., at PP 59-61.

In a letter submitted to the sentencing court, Crowley wrote that "McBroom developed a compulsion with regard to viewing pornography. . . . Although Mr. McBroom understood the moral and legal implications of this activity, he was unable to discontinue the practice. . . . It is evident that Mr. McBroom is experiencing the symptoms of a person who has been sexually abused as a child. . . . The excessive use of pornography by Mr. McBroom is also a common behavior pattern of survivors of childhood abuse."

In a letter submitted to the sentencing court, Dr. Gartner reported that "McBroom as an adolescent and adult has exhibited many of the most common sequelae of childhood sexual abuse, particularly abuse by a loved caretaker and role model. His symptoms have included a wide spectrum of obsessive and compulsive behaviors, including severe

12

alcoholism and drug abuse, sexual compulsivity (particularly related to pornography) . . . . His recent fascination with pornography involving underage girls seems to reflect a sense of his own undeveloped and unevolved adolescent sexual identity. This is probably related to his traumatic preadolescent and adolescent molestation, and his consequent dread of adult sexuality as well as fascination with adolescent sexuality."

In a brief letter submitted to the sentencing court, Dr.

Winchel reported that he diagnosed McBroom as having Cyclothymic Disorder (a bipolar mood disorder) and Impulse Control Disorder.

The district court found that McBroom suffered from bipolar disorder, manic depression, and multiple disorders of impulse control. Additionally, the court found that McBroom suffered from a childhood and adolescence seriously marred by continuous sexual abuse at the hands of his father. The court was hesitant, however, tofind that McBroom's "troubled childhood" qualified him for a departure from the guideline range.

The court then noted that "courts have found that a downward departure is unavailable where there was `no indication that [the defendant] was unable to process information or to reason.' " Slip Op. at 10 (quoting United States v. Johnson, 979 F.2d 396, 401 (6th Cir. 1992)). According to the court, "a defendant able to absorb information in the usual way and to exercise the power of reason is not suffering from a significantly reduced mental capacity under U.S.S.G. S 5K2.13." Slip Op. at 10 (quotations omitted).

The district court denied McBroom's request for a downward departure. The court was persuaded by the fact that McBroom did not claim that he "does not voluntarily participate in the transmissions of child pornography, nor does he claim that he did not understand what he was doing or the wrongful nature of his acts." Slip Op. at 10. According to the court,

> [McBroom] clearly possessed his mental and intellectual faculties and was capable of exercising the power of reason. Not only did [McBroom] enter the

13

> Internet to explore its cache of child pornography, but [he] also engaged in complex transactions across the Internet. He knowingly formed criminal networks of child pornography suppliers and collectors with whom to share unlawful materials, thereby fueling the market for child pornography.
>
> Because there is no evidence that [McBroom's] mental capacity was significantly reduced, there exists no factual basis upon which the Court can grant a departure.

Id. The district court sentenced McBroom to fifteen months in prison, the minimum sentence for a person with an

offense level of thirteen and a criminal history category of II.

McBroom moved the district court to reconsider its decision not to depart downward under section 5K2.13. In support of his motion, McBroom submitted two supplemental reports.

In the first supplemental report, Dr. Gartner stated that McBroom has exhibited symptoms of childhood sexual abuse, including a "wide spectrum of obsessive and compulsive behaviors . . . . This compulsivity has extended to viewing pornography, usually pictures of adults but including pornographic pictures of young girls that were sent to him on the Internet." Dr. Gartner concluded: "[T]his compulsivity led to a significantly reduced mental state which contributed in a large degree to Mr. McBroom's commission of the offense for which he has been convicted."

In the second supplemental report, Dr. Winchel commented that "[i]f the phrase `significantly reduced mental state' is intended to include a reduced capacity for choice, and acting under the influence of compulsion, resultant from a psychiatric disorder, then Mr. McBroom's condition, in my view, amply fulfills that definition." Dr. Winchel stated that "McBroom, at various times in his life, has fulfilled criteria for 4 different disorders of impulse control."

Dr. Winchel explained that individuals suffering from an impulse disorder have an "overwhelming quality of the urge to commit the action toward which the individual feels

14

driven. In most cases of impulse disorder, attempts to not act in accordance with the compulsion is associated with increasingly painful states of tension and agitation which can generate profound mental suffering."

Dr. Winchel cautioned that the impulse disorder may not be obvious in syndromes where there may appear to be a motive for the individual's actions: "the apparent potential for erotic pleasure present when any person looks at pornography may inhibit understanding of the overwhelmingly compulsive nature that some experience -- a phenomenon which is not about erotic gratification, but about an attempt to control the overwhelming mental pain and tension that may accompany an unfulfilled compulsion." Dr. Winchel concluded that McBroom's "actions and mental states in regard to the pornographic material contain evidence of impulsive discontrol of his behavior."

The district court denied McBroom's motion for reconsideration.7 McBroom timely appealed from the court's judgment of sentence.

On appeal, McBroom does not argue that the district court erred when it found that he is able to absorb information in the usual way and to exercise the power of reason. Rather, he contends that the court took too narrow a view of the term "significantly reduced mental capacity" and thereby improperly excluded from section 5K2.13 certain individuals who, while able to absorb information in the usual way and to exercise the power of reason, are incapable of controlling their behavior and conforming it to the law.

_____

7. Citing Fed. R. Crim. P. 35, the district court concluded that it lacked jurisdiction to reconsider a criminal sentence. The court also noted that it did not overlook any dispositive factual matters or controlling decisions of law in its sentencing decision; according to the court, counsel had the opportunity to, and did, introduce information on McBroom's psychiatric state before sentencing.

15

C.

Our jurisdiction over this appeal is grounded in 28 U.S.C. S 1291 and 18 U.S.C. S 3742. The district court denied McBroom's motion for a downward departure because it believed that it lacked discretion to depart from the guidelines range. Specifically, the court held that "a defendant able to absorb information in the usual way and to exercise the power of reason" is not entitled to a downward departure, and then it determined that McBroom was able to reason and to absorb information in the usual way. Slip Op. at 10.8 Because the court believed that a departure was legally impermissible under the guidelines, we have jurisdiction to determine whether the court's understanding of the guidelines was correct. United States v. Denardi, 892 F.2d 269, 272 (3d Cir. 1989); see also United States v. Mummert, 34 F.3d 201, 205 (3d Cir. 1994); United States v. Hamilton, 949 F.2d 190, 193 (6th Cir. 1991) (per curiam) (district court's conclusion that type of mental state claimed by defendant does not fit within section 5K2.13 is legal conclusion reviewable on appeal); United States v. Poff, 926 F.2d 588, 590-91 (7th Cir. 1991) (en banc) (same).9

Whether a factor is a permissible basis for departure is a

_____

8. The court resolved any possible doubts about the reason for its sentencing decision at McBroom's bail hearing:

> I was very careful, I was very careful in that decision. I didn't say I had the authority to depart and I chose not to depart; because I wanted that issue presented to the appellate court. And I made it very clear that I was making a decision not on the exercise of discretion, but on the basis that I did not have the discretion as I read the Guidelines. So there is an issue on appeal that has to be addressed by the Circuit Court.

While we are not bound by the district court's understanding of its own decision, it is apparent that the district court believed that it was without discretion to depart from the guidelines pursuant to section 5K2.13.

9. In contrast, if the court's ruling had been based on an exercise of discretion, we would have lacked jurisdiction to review the court's exercise of that discretion. Denardi, 892 F.2d at 272; Mummert, 34 F.3d at 205.

16

question of law, Koon v. United States, 116 S.Ct. 2035, 2047 (1996), and our review of the sentencing court's construction of the Sentencing Guidelines is therefore plenary. United States v. Oser, 107 F.3d 1080, 1083 (3d Cir. 1997). We review the specific question of whether the district court had the authority to depart downward based on the factor of diminished capacity under an abuse of discretion standard. United States v. Sally, 116 F.3d 76, 78 (3d Cir. 1997). In addition to permitting an appellate court to review the exercise of a district court's discretion for abuse, the abuse of discretion standard allows us to determine whether the district court was guided by erroneous legal conclusions when exercising its discretion. Koon, 116 S.Ct. at 2047-48. An abuse of discretion standard does not mean, therefore, that a mistake of law is beyond appellate correction. "A district court by definition abuses its discretion when it makes an error of law." Id. at 2047.

III.

Before we reach the question of whether McBroom suffered from a significantly reduced mental capacity, we must determine whether McBroom committed a "non-violent offense." A downward departure pursuant to section 5K2.13 is not available to any defendant, regardless of the

state of his or her mental capacity, if the offense of conviction is not "non-violent." The defendant bears the burden of proving, by a preponderance of the evidence, that the crime is non-violent. United States v. Rosen , 896 F.2d 789, 791 (3d Cir. 1990); United States v. McDowell, 888 F.2d 285, 291 (3d Cir. 1989). The district court did not dwell on this issue; according to the court, "it is clear that [McBroom] committed a crime that is non-violent."

In this appeal, the government contends that the crime of possession of child pornography is not a "non-violent offense" and that McBroom is therefore not entitled to a downward departure under section 5K2.13.

A.

In Rosen, the defendant was convicted on a plea of guilty to the charge of sending a threatening communication

through the mail with the intent to extort money through threat of injury in violation of 18 U.S.C. S 876. 896 F.2d at 790. We rejected the defendant's claim that the offense was non-violent because it did not involve the actual use of physical force, and we held that the district court did not have the authority to depart downward under section 5K2.13 because the offense was not a "non-violent offense." Id. at 791.

The basis for our holding in Rosen was that the definition of "crime of violence" contained in section 4B1.2, which is the career offender provision, governs the meaning of "non-violent offense" in section 5K2.13. Id. According to section 4B1.2, the term "crime of violence" means any offense under federal or state law punishable by imprisonment for a term exceeding one year that (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another," or (2) is "burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G.S 4B1.2(1); see also U.S.S.G. S 4B1.2, comment. (n.1-2) (providing additional discussion of term "crime of violence"). Because the defendant's crime of extortion had as an element the threatened use of force, the crime was a "crime of violence" under section 4B1.2 and was not, therefore, a "non-violent offense" under section 5K2.13. Rosen, 896 F.2d at 791.

Bound as we are by our decision in Rosen, 3d Cir. I.O.P. 9.1, we conclude that the offense of possession of child pornography in violation of 18 U.S.C. S 2252(a)(4) is a "non-

violent offense." The mere possession of child pornography does not have as an element the use, attempted use, or threatened use of physical force against the person of another, and it is not the type of offense listed in section 4B1.2(1) or the application notes to section 4B1.2. Possession of child pornography is not, therefore, a "crime of violence," and, pursuant to Rosen, it must be a "non-violent offense."10

_____

10. We acknowledge that the term "crime of violence" is defined in 18 U.S.C. S 3156(a)(4) to include any felony under chapter 109A or chapter 110 of Title 18, including possession of child pornography. While we are

18

B.

We recognize that our holding in Rosen that the term "crime of violence" means the opposite of the term "non-violent offense" is currently the subject of considerable debate. Five other courts of appeals have reached the same conclusion that we reached in Rosen. United States v. Mayotte, 76 F.3d 887, 889 (8th Cir. 1996); United States v. Dailey, 24 F.3d 1323, 1325-27 (11th Cir. 1994); United States v. Poff, 926 F.2d 588, 591-93 (7th Cir. 1991) (en banc); United States v. Borrayo, 898 F.2d 91, 94 (9th Cir. 1989); United States v. Maddalena, 893 F.2d 815, 819 (6th Cir. 1989). Two courts of appeals, however, following the dissent in Poff, 926 F.2d at 593-96 (Easterbrook, J., dissenting), have concluded that the "non-violent offense" requirement of section 5K2.13 is not governed by the"crime of violence" definition contained in section 4B1.2. United States v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994); United States v. Chatman, 986 F.2d 1446, 1450 (D.C. Cir. 1993). Rather, those courts believe that "the sentencing court has broad discretion under section 5K2.13 to examine all the facts and circumstances of a case to determine whether a particular offense was in fact `non-violent.' " Chatman, 986 F.2d at 1450.

Our court, sitting en banc, may soon revisit the issue in United States v. Askari, No. 95-1662, 1997 WL 92051 (3d Cir. March 5, 1997) (per curiam), reh'g en banc granted, opinion vacated, 1997 WL 92051, *6 (March 27, 1997). In Askari, we held that an unarmed bank robbery is not a "non-violent offense" under section 5K2.13 because it is a "crime of violence" under section 4B1.2. 1997 WL 92051, *2 (citing Rosen, 896 F.2d at 791). In a concurring opinion in which he urged us to reconsider the issue en banc, Judge Becker wrote that "it does not make sense to import a career offender-based definition of `crime of violence' into a

_____

concerned that Congress, in 18 U.S.C. S 3156, and the Sentencing Commission, in U.S.S.G. S 4B1.2, chose to define a single term -- "crime of violence" -- in very different ways, the definition contained in section
3156(a)(4) is only applicable to the term as used in 18 U.S.C. SS 3141-3150. Since we applied the guidelines definition of "crime of violence" in Rosen, we do the same here.

19

departure section in the absence of a specific cross-reference." "Rather," Judge Becker concluded, "it is better to permit the district courts to consider all the facts and circumstances surrounding the commission of a crime when deciding whether it qualifies as a non-violent offense under S 5K2.13." 1997 WL 92051, *6. We granted rehearing en banc and vacated the per curiam opinion.

Recognizing that we are presently bound by Rosen and that possession of child pornography is a "non-violent offense" under our precedent, we nonetheless briefly analyze the subject offense under the case-by-case approach suggested by Judge Easterbrook in Poff and by Judge Becker in Askari. We do so not to predict how the en banc court will decide Askari, but because we conclude that, even under the case-by-case approach, the possession of child pornography is a "non-violent offense."

According to the government, "[p]ossession and dissemination of child pornography, by statutory definition, entails the sexual exploitation of minors, which, in any form, entails violence against children. . . . With each computer transmission of child pornography, not only is the child who is depicted victimized yet at least a trace more, but the market for child pornography is fueled, pedophiles potentially inspired, and more children ultimately victimized." We are not unsympathetic to the government's concerns; possession of child pornography is not a victimless crime. See, e.g., United States v. Harvey, 2 F.3d 1318, 1328 n.12 (3d Cir. 1993) (discussing harm Congress sought to avoid by punishing possession of child pornography).

A review of the facts and circumstances surrounding the commission of the crime, however, persuades us that the mere possession of child pornography in this context is a "non-violent offense." Initially, the crime for which McBroom was convicted, possession of child pornography in violation of 18 U.S.C. S 2252(a)(4), does not have as an element the use of physical force or violence. McBroom was

convicted of a crime of possession, not a crime of violence.

In addition, McBroom was not convicted of any offenses involving contact with children or the production of child

pornography. See, e.g., 18 U.S.C. S 2251 (sexual exploitation of children); id. S 2251A (selling or buying of children). On the record here, McBroom had no direct contact with children in furtherance of his efforts to possess child pornography, and he did not solicit others to sexually exploit children in order to obtain additional depictions. He was also not convicted of transporting or receiving child pornography. Id. S 2252(a)(1), (2).

The record is devoid of any evidence that McBroom's conduct involved "violence in fact." Askari, 1997 WL 92051, *2 (Becker, J., concurring). The record indicates that McBroom downloaded images of child pornography from the abundance of images already available on the Internet, and that he stored those images on his computer's hard drive.

Finally, McBroom's conduct did not involve a threat of violence. Compare Poff, 926 F.2d at 594 (Easterbrook, J., dissenting) ("A `non-violent offense' . . . is one in which mayhem did not occur."), with Chatman, 986 F.2d at 1454 (an offense that never resulted in physical violence but that did involve a "real and serious" threat of violence is not a "non-violent" offense).11

As the government argues, it is the market for child pornography that ultimately leads to the victimization of children, and McBroom was surely part of that market. This fact does not make McBroom the perpetrator of a violent offense, however, any more than a possessor of marijuana contributes to the often-violent illicit drug trade. Assuming section 5K2.13 required us to decide whether a particular defendant committed a "non-violent offense" as a matter of fact, we would look first to the facts and circumstances surrounding the commission of the offense of conviction, and not to the derivative, but potentially inevitable, consequences of the defendant's conduct.

Because the commission of the crime for which McBroom was convicted did not involve any actual or threatened

_____

11. Of course, we need not and do not decide whether, and at what point, an offense involving threatened violence (but no violence in fact) would not be a "non-violent offense" under the case-by-case approach.

violence in fact, and because the use or threat of force is not an element of the crime, we believe that, under the case-by-case approach suggested by Judge Easterbrook in Poff and by Judge Becker in Askari, McBroom committed a "non-violent offense." Of course, as noted above, our conclusion that McBroom committed a "non-violent offense" is anchored in our conclusion that possession of child pornography is not a "crime of violence" under section 4B1.2 of the guidelines. Rosen, 896 F.2d at 791.

Having determined that McBroom "committed a non-violent offense," we must now decide whether the district court properly considered McBroom's claim that he committed that offense "while suffering from significantly reduced mental capacity." U.S.S.G. S 5K2.13, p.s.

IV.

McBroom contends that the definition of "significantly reduced mental capacity" contains a volitional component not adequately considered by the district court. We agree. We believe that a defendant's ability to control his or her own conduct is a relevant consideration when determining the defendant's eligibility for a downward departure pursuant to section 5K2.13.

A.

Our analysis begins with a brief look back to the modern dawn of common law recognition of insanity as a defense to criminal charges. In M'Naghten's Case, the House of Lords ruled that the insanity defense applies if the accused "was labouring under such a defect of reason, from a disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." 10 Cl. & Fin. 200, 210, 8 Eng. Rep. 718, 722 (H.L. 1843).

In the twentieth century, the M'Naghten Rule came under heavy criticism because it "misleadingly focused attention on the capacity to distinguish `right' from `wrong' at a time when recognized psychiatric impairments were understood as unitary entities which distorted both cognitive and

effective capacities." Government of Virgin Islands v.

Fredericks, 578 F.2d 927, 937 (3d Cir. 1978) (Adams, J., dissenting) (emphasis supplied); see also Durham v. United States, 214 F.2d 862 (D.C. Cir. 1954) (rejecting M'Naghten Rule). In 1955, the American Law Institute introduced an alternative to the Rule, which was subsequently adopted into the Model Penal Code. The ALI standard provides:

> A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

Model Penal Code S 4.01(1) (emphasis supplied). The ALI standard is significant because it introduced a "volitional prong," which considers defects of control, in addition to the "cognitive prong," already present in the M'Naghten Rule, which considers only defects of reason and intellect.

In United States v. Currens, 290 F.2d 751 (3d Cir. 1961), we too rejected the M'Naghten Rule as "unworkable" and a "sham." Id. at 765. We noted that a test based on one's ability to know right from wrong misses the point: "Our institutions contain many patients who are insane or mentally ill or mentally diseased and who know the difference between right and wrong." Id. at 765.

Faced with the difficult task of formulating a proper test, we focused on the element of control:

> The concept of mens rea, guilty mind, is based on the assumption that a person has a capacity to control his behavior and to choose between alternative courses of conduct. This assumption, though not unquestioned by theologians, philosophers and scientists, is necessary to the maintenance and administration of social controls. It is only through this assumption that society has found it possible to impose duties and create liabilities designed to safeguard persons and property. . . . Essentially these duties and liabilities are intended to operate upon the human capacity for choice and control of conduct so as to inhibit and deter socially harmful conduct. When a person possessing capacity for choice and control, nevertheless breaches

23

> a duty of this type he is subjected to the sanctions of the criminal law. He is subject to these sanctions not because of the act alone, but because of his failure to exercise his capacity to control his behavior in conformity with the demands of society.

Id. at 773. We concluded that "the sanctions of the criminal law are meted out in accordance with the actor's capacity to conform his conduct to society's standards, through the capacity for choice and control which he possessed with respect to his act." Id.

We thus announced the following test: "The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of a mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated." Id. at 774.

The Currens "capacity to conform" test was drawn in part from the test proposed by the American Law Institute in its Model Penal Code. Id. at 774 n.32. We intentionally did not adopt the phrase "to appreciate the criminality of his conduct" from the Model Penal Code, however, finding that the phrase would "overemphasize the cognitive element in criminal responsibility and thus distract the jury from the crucial issues while being little more than surplusage." Id.

We utilized the Currens test until Congress provided a statutory formulation of the federal insanity defense by passing the Insanity Defense Reform Act of 1984, Pub. L. No. 98-473, Title II, S 402(a), 98 Stat. 2057, S 20, recodified at 18 U.S.C. S 17 ("IDRA"). The IDRA provides:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. S 17(a). Congress thus deleted the "volitional prong" of the insanity defense found in both the Model Penal Code and in Currens, United States v. Pohlot, 827

F.2d 889, 896 (3d Cir. 1987), in favor of exclusive reliance on the "cognitive prong" of M'Naghten's Case.12 Indeed, the IDRA, with its emphasis on an accused's ability to appreciate the nature and quality, or the wrongfulness, of his or her actions, is, at its core, a modern version of the M'Naghten Rule.

B.

When the Sentencing Commission promulgated policy
statement 5K2.13, it did not define the term "significantly
reduced mental capacity." We do not believe, however, that
the Commission intended to preclude district courts from
considering volitional impairments during the sentencing
phase in the same manner in which Congress precluded
consideration of volitional impairments as an affirmative
insanity defense.

The IDRA does not permit a defendant to rely on a
mental disease or defect as an affirmative insanity defense
unless the disease or defect renders the accused unable to
appreciate the nature and quality or the wrongfulness of
his acts. This is true even if the disease or defect
substantially contributed to the commission of the offense.
In sharp contrast, when a court considers the sentencing of
a convicted defendant, guideline section 5K2.13 may apply
once the accused's reduced mental capacity "contributed to
the commission of the offense" -- without regard to how the
reduced mental capacity so contributed. U.S.S.G. S 5K2.13,
p.s.

For example, if a defendant's reduced mental capacity
prevents the individual from appreciating the wrongfulness
of certain conduct, section 5K2.13 may apply so long as the
other requirements of that section are satisfied (and
assuming the defendant is not entitled to a complete
affirmative insanity defense pursuant to 18 U.S.C. S 17).
Likewise, if an individual is capable of appreciating the
nature, quality, and wrongfulness of certain acts, but is

_____

12. Defendants may still introduce evidence of mental abnormality in
order to negate mens rea and disprove an element of the crime itself.
Pohlot, 827 F.2d at 895-902.

25

unable to control the conduct due to reduced mental
capacity, section 5K2.13 may also apply. Thus, section
5K2.13 retains both a "cognitive prong" and a "volitional
prong."

This interpretation of section 5K2.13 makes sense. The
Court of Appeals for the Seventh Circuit explained:

> [I]n the criminal law generally, and under the
> guidelines as well, though no longer in the federal
> defense of insanity, 18 U.S.C. S 17(a), the term `mental
> capacity' refers to action as well as to understanding.
> The mind is the organ of volition as well as of
> reflection. A person who knows what he is doing and

that it is wrong but cannot control himself is deficient in mental capacity.

United States v. Pullen, 89 F.3d 368, 370-71 (7th Cir. 1996) (internal citations omitted), cert. denied, 117 S.Ct. 706 (1997). The court thus recognized that the term"mental capacity" as used in section 5K2.13 encompasses both a cognition prong and a volition prong. We agree.

In Currens, we reasoned that the duties and liabilities imposed by our society on its members are "intended to operate upon the human capacity for choice and control of conduct so as to inhibit and deter socially harmful conduct." 290 F.2d at 773 (emphasis supplied). Since passage of the IDRA, this rationale no longer applies to individuals pleading insanity as an affirmative defense. It remains viable, however, in the sentencing phase. As we stated in Currens, our system of criminal justice punishes criminals not because of the act alone, but because of the offender's failure to exercise his capacity to control his behavior in conformity with the demands of society. Id. Justice demands that sentencing courts be able to consider an offender's capacity to control his behavior before determining an appropriate sentence. Section 5K2.13 provides courts with the ability to do just that.

Judge Easterbrook explained why it is appropriate to consider volitional impairments in making sentencing determinations:

> The criminal justice system long has meted out lower sentences to persons who, although not technically

26

> insane, are not in full command of their actions. . . . Persons who find it difficult to control their conduct do not -- considerations of dangerousness to one side-- deserve as much punishment as those who act maliciously or for gain.

Poff, 926 F.2d at 595 (Easterbrook, J., dissenting). We agree.

C.

The issue of volitional incapacity as a basis for downward departure has rarely been directly addressed by the courts. The courts have instead focused on defendants' cognitive abilities. In United States v. Hamilton, 949 F.2d 190 (6th Cir. 1991) (per curiam), the defendant pled guilty to possession of controlled substances with intent to

distribute. The defendant asserted that a gambling disorder caused him to suffer from a "significantly reduced mental capacity." Id. at 191. The Court of Appeals for the Sixth Circuit disagreed, finding that the defendant "was able to absorb information in the usual way and to exercise the power of reason. He took to selling drugs illegally not because of any inability to understand his situation, but because he needed money." Id. at 193.

While the court relied on the defendant's ability to "absorb information in the usual way and to exercise the power of reason" when rejecting his claim for a downward departure, the court did not cite to any legal or medical authority for its apparent conclusion that an individual's ability to absorb information and to reason is equated with his "mental capacity." Nevertheless, the court's emphasis on the defendant's intellectual, or cognitive, capacity was soon replicated.

The Court of Appeals for the Fourth Circuit adopted the Hamilton standard in United States v. Goossens, 84 F.3d 697 (4th Cir. 1996). The district court found that Goossens had been diagnosed as suffering from anxiety disorder and had other psychological problems. Id. at 699-700. Nonetheless, Goossens was a man of "above average intellectual capacity," possessed a "high level of mental functioning," and "was employed in a responsible position."

27

Id. at 701. The court of appeals held that "in order for a defendant's mental condition to be considered `a significantly reduced mental capacity' within the meaning of S 5K2.13, p.s., the defendant must have been unable to process information or to reason." Id. The court concluded that Goossens was not entitled to a downward departure under section 5K2.13 because of his above-average cognitive function.

It thus appears that, for some of our sister courts of appeals, an individual's inability to reason or to absorb information in the usual way is the sine qua non of reduced mental capacity, and a defendant who is able to reason and to absorb information in the usual way is ineligible for a downward departure under section 5K2.13. See, e.g., United States v. Withers, 100 F.3d 1142, 1148 (4th Cir. 1996) (defendant ineligible for downward departure because she failed to show that her depression rendered her unable to process information or to reason; "she was fully capable of following a complex set of instructions to transport heroin successfully into the United States"), cert. denied, 117 S.Ct. 1282 (1997); United States v. Edwards, 98 F.3d

1364, 1367 (D.C. Cir. 1996) (rejecting defendant's argument that "mental capacity" has meaning apart from intellectual capacity; holding that psychological or behavioral disorders could not serve as basis for departure based on reduced mental capacity absent "accompanying inability to reason"), cert. denied, 117 S.Ct. 1437 (1997); United States v. Barajas-Nunez, 91 F.3d 826, 831 (6th Cir. 1996) (diminished mental capacity is found where defendant's condition affects ability to process information or to reason); United States v. Johnson, 979 F.2d 396, 401 (6th Cir. 1992) (defendant, who "displayed considerable mental agility in his professional and personal affairs," was able to process information and to reason; section 5K2.13 downward departure held unavailable).

Our sister courts' apparent focus on an offender's ability to absorb information and to reason may be more the result of the arguments raised by the offenders in each specific case than of a conscious decision to disregard volitional impairments. Indeed, we are in agreement with these courts that a sentencing court may consider a defendant's

28

cognitive incapacity during the sentencing phase. To the extent that some of these courts have purposely limited section 5K2.13 to its cognitive prong, however, we cannot agree to such a narrow reading of the guidelines.

Section 5K2.13 is intended to create lenity for those whose significantly reduced mental capacity cause them to commit the offense of conviction. In United States v. Chatman, 986 F.2d 1446 (D.C. Cir. 1993), the court recognized that the purpose of section 5K2.13 is to "treat with lenity" individuals whose significantly reduced mental capacity contributed to the commission of the crime. Id. at 1452. The court reasoned that such lenity is appropriate because "two of the primary rationales for punishing an individual by incarceration -- desert and deterrence -- lose some of their relevance when applied to those with reduced mental capacity." Id.

Likewise, in United States v. Cantu, 12 F.3d 1506 (9th Cir. 1993), the court of appeals recognized that "[l]enity is appropriate because the purpose of S 5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime." Id. at 1511. The courts' discussions of lenity in Chatman and Cantu apply with equal force to those who cannot comprehend right from wrong and to those who cannot control their behavior. See United States v. Weddle, 30 F.3d 532, 540 (4th Cir. 1994) (section 5K2.13 creates lenity for those who

cannot control their actions but who are not actually dangerous).

D.

We conclude that the Sentencing Commission intended to include those with cognitive impairments and those with volitional impairments within the definition of "reduced mental capacity." We believe that the following test adequately addresses our concerns that a sentencing court consider both a defendant's cognitive capacity and his or her volitional capacity when considering a downward departure pursuant to section 5K2.13: A person may be suffering from a "reduced mental capacity" for the purposes of section 5K2.13 if either:

29

> (1) the person is unable to absorb information in the usual way or to exercise the power of reason; or

> (2) the person knows what he is doing and that it is wrong but cannot control his behavior or conform it to the law.

The first prong permits sentencing courts to consider defects of cognition. The second prong permits sentencing courts to consider defects of volition. Sentencing courts must consider both prongs before making a determination about a defendant's "reduced mental capacity."

We are reminded that a mere reduction in mental capacity is not sufficient to warrant a departure; section 5K2.13 requires that the reduced mental capacity be "significant" before a downward departure may be considered.13 Likewise, a departure, if granted, should reflect the extent to which the offender's reduced mental capacity contributed to the commission of the offense.14 As we noted above, a departure may not be granted where the offense is not "non-violent," and a departure is not warranted when the defendant's criminal history indicates a need for incarceration to protect the public. In addition, the reduction in mental capacity may not be the result of

_____

13. We are reluctant to set forth general principles delineating when mental capacity is so "significantly reduced" as to warrant consideration for a downward departure. We rely instead on the sentencing court's "institutional advantage over appellate courts in making these sorts of determinations." United States v. Sally, 116 F.3d 76, 81 (3d Cir. 1997) (quoting Koon, 116 S.Ct. at 2047). The Court in Koon recognized the "special competence" of sentencing courts in determining "whether a

discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way." Koon, 116 S.Ct. at 2047; cf. Sally, 116 F.3d at 81 (leaving to district courts the determination of "what post-conviction rehabilitation efforts may be considered so extraordinary or exceptional as to warrant a downward departure"). We, likewise, believe that the district courts have the resources to determine whether a defendant's reduced mental capacity is "significant."

14. A defendant's "significantly reduced mental capacity" must be a contributing cause of the offense, but need not be the sole cause. United States v. Soliman, 954 F.2d 1012, 1014 (5th Cir. 1992); United States v. Glick, 946 F.2d 335, 339 (4th Cir. 1991); United States v. Ruklick, 919 F.2d 95, 97-98 (8th Cir. 1990).

the offender's voluntary use of drugs or other intoxicants.15 Taken together, the requirements of section 5K2.13 are not easily met. In addition, the district courts retain their discretion to deny a downward departure even when a defendant does satisfy his burden. We therefore believe that our decision will not open the floodgates to every defendant who "felt compelled" to commit a crime.

We note that although a defendant must be suffering from something greater than mere "emotional problems" to obtain a downward departure, United States v. Gentry, 925 F.2d 186, 188 (7th Cir. 1991), certain emotional conditions may be the cause of a defendant's significantly reduced mental capacity. In Cantu, the court of appeals noted that section 5K2.13 applies to both mental defects and emotional disorders: "Such applications are appropriate. To artificially distinguish organic syndromes (mental defects) from emotional disorders is to ignore the increasingly blurry line between them." Id. at 1512; see also id. ("Treating emotional illnesses in the same way that we do mental abnormalities furthers the purpose of S 5K2.13."). As the court concluded in Cantu, "[t]he focus of the guideline provision is reduced mental capacity, not the cause -- organic, behavioral, or both -- of the reduction." Id. (emphasis in original).

V.

We turn now to the case at hand. Guided by the standard first announced in Hamilton, the district court concluded that "a defendant able to absorb information in the usual way and to exercise the power of reason" is not eligible for a downward departure under section 5K2.13. According to the court, McBroom "clearly possessed his mental and intellectual faculties and was capable of exercising the power of reason." The court cited as an

example of McBroom's intellectual capacity the fact that he "engaged in complex transactions across the Internet."

_____

15. Although McBroom has a history of drug and alcohol abuse, the government does not contend that McBroom's use of drugs and alcohol caused him to suffer from a significantly reduced mental capacity.

On appeal, McBroom does not contend that he is unable to absorb information in the usual way or to exercise the power of reason. Rather, McBroom asserts that, despite his cognitive ability, he was unable to exercise control over his own behavior. It was the absence of volitional capacity, McBroom argues, that compelled him to view and possess child pornography. McBroom's ability to absorb information and to reason is therefore irrelevant to his efforts to obtain a downward departure.

The reports submitted on behalf of McBroom contain information that is relevant to a determination regarding McBroom's volitional capacity. In a letter submitted to the sentencing court, Crowley wrote that "McBroom developed a compulsion with regard to viewing pornography. . .. Although Mr. McBroom understood the moral and legal implications of this activity, he was unable to discontinue the practice." Dr. Gartner reported that McBroom, like other victims of childhood sexual abuse, exhibited a number of obsessive and compulsive behaviors, including sexual compulsivity. Dr. Winchel reported that he diagnosed McBroom as having Cyclothymic Disorder (a bipolar mood disorder) and Impulse Control Disorder. According to the American Psychiatric Association,

> The essential feature of Impulse-Control Disorders is the failure to resist an impulse, drive, or temptation to perform an act that is harmful to the person or to others. For most of the disorders in this section, the individual feels an increasing sense of tension or arousal before committing the act and then experiences pleasure, gratification, or relief at the time of committing the act. Following the act there may or may not be regret, self-reproach, or guilt.

American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 609 (4th ed. 1994) ("DSM-IV").16

_____

16. Dr. Winchel diagnosed McBroom as having "Impulse Control Disorder Not Otherwise Specified," classified as DSM-IV Code 312.30. This category is for disorders of impulse control that do not meet the

criteria for any specific Impulse Control Disorder or for other mental disorders having features involving impulse control described elsewhere in DSM-IV.

As noted above, McBroom submitted two supplemental reports in support of his motion for reconsideration of the district court's sentencing decision. Dr. Gartner supplemented his initial report by stating that McBroom's obsessive and compulsive behaviors extended to child pornography. Dr. Gartner reported that McBroom suffered from obsessive-compulsive disorder complicated by Cyclothymia, an aftereffect of his childhood sexual abuse and a significant contributing factor in his possession of child pornography. In his supplemental report, Dr. Winchel stated that McBroom suffered from a psychiatric disorder that caused him to act under the influence of compulsion.

We express no view about the merits of McBroom's claim of significantly reduced mental capacity. This determination should be made by the district court in the first instance.17

_____

We are mindful of DSM-IV's "Cautionary Statement," which provides:

    The purpose of DSM-IV is to provide clear descriptions of diagnostic
    categories in order to enable clinicians and investigators to
    diagnose, communicate about, study, and treat people with various
    mental disorders. It is to be understood that inclusion here . . . does
    not imply that the condition meets legal or other nonmedical criteria
    for what constitutes mental disease, mental disorder, or mental
    disability. The clinical and scientific considerations involved in
    categorization of these conditions as mental disorders may not be
    wholly relevant to legal judgments, for example, that take into
    account such issues as individual responsibility, disability
    determination, and competency.

DSM-IV, at xxvii. While the term "mental capacity" as used in section 5K2.13 is a legal, not a medical term, we believe that evaluation of a defendant's mental capacity must necessarily be informed by an appreciation and understanding of the defendant's medical condition.

17. It is possible that the court may find that the evidence offered by McBroom is insufficient to establish a significantly reduced mental capacity. It is also possible that the court mayfind that McBroom suffered from a significantly reduced mental capacity but that it was unrelated to the commission of the offense. On the other hand, the district court might find that McBroom was unable to exercise control

over his actions in possessing child pornography and that he suffered from a volitional impairment sufficient to warrant a downward departure under section 5K2.13. The court might also find that McBroom is eligible for a downward departure under section 5K2.13, but in the exercise of its discretion not grant such a departure. Otherfindings are also possible.

33

We leave it to the district court to determine whether McBroom suffered from a significantly reduced mental capacity and, if so, whether a departure is warranted and appropriate under section 5K2.13. Because we conclude that the court improperly limited its review to the issue of whether McBroom was able to absorb information in the usual way and to exercise the power of reason, however, we will remand so that the court may consider McBroom's assertion that he was unable to control his behavior or conform it to the law.

How the district court chooses to undertake this analysis is a matter within its discretion. We think, however, that the court may not wish to decide this issue on the present record. It is apparent that, when it focused exclusively on McBroom's ability to absorb information in the usual way and to exercise the power of reason, the district court was guided by the principles announced by some of our sister courts of appeals. Those principles may have also guided the parties' argument and presentation of evidence. Given that the standard we announce today represents a different approach, the district court may wish to reopen the record and permit both McBroom and the government to submit new evidence and argument on the volitional incapacity issue.

VI.

We take this opportunity to address two additional concerns about the district court's first sentencing decision.

First, the district court was persuaded in part by McBroom's ability to engage in complex transmissions across the Internet, and we are aware of McBroom's ability to practice law even as his consumption of alcohol, drugs, and pornography grew more severe. We note, however, that an individual's average or above-average mental capacity in one aspect of his or her affairs is not necessarily relevant to a determination about the individual's mental capacity in another aspect. If McBroom did suffer from an inability to control his behavior in the possession of child pornography, that does not necessarily mean that he was also unable to learn how to access the Internet or, for that matter, to

conduct a successful law practice. The converse is also true. The fact that McBroom may have been proficient on the Internet does not necessarily indicate that he was not compelled by reduced mental capacity to use that proficiency to obtain child pornography.

On remand, the district court may certainly consider evidence of how McBroom conducted his affairs when determining whether he suffered from a significantly reduced mental capacity. We are mindful, however, that McBroom claims that he suffered from a very discrete volitional impairment, and evidence of advanced mental capacity in one area may not be relevant in deciding whether McBroom's claim has merit.

Second, McBroom claims that his reduced mental capacity had its origins in the sexual abuse he suffered as a child. The court noted, however, that courts are hesitant to find a "troubled childhood" as a basis for departure from the guidelines range. The district court's concern may be unwarranted here. McBroom is not seeking a downward departure because he was a victim of sexual abuse. Rather, McBroom claims that at the time of the offense, he suffered from a significantly reduced mental capacity. McBroom points to his childhood merely to explain why his mental capacity was reduced to the point where he felt compelled to possess child pornography.

When determining whether a defendant suffers from a significantly reduced mental capacity, a sentencing court may appropriately consider the asserted underlying cause of the impairment. The district court properly declined to consider McBroom's "troubled childhood" in a vacuum. U.S.S.G. S 5H1.12, p.s. ("Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range."). On remand, however, the sentencing court may look to that childhood to inform its determination regarding whether McBroom suffered from a significantly reduced mental capacity at the time of the offense.

In United States v. Withers, 100 F.3d 1142 (4th Cir. 1996), cert. denied, 117 S.Ct. 1282 (1997), the court of

appeals cautioned courts not to "create incentives for defendants to comb their personal circumstances in order to find evidence of hardship or misfortune. This search, we suspect, would almost always be fruitful given that adversity in its infinite variety comes with the journey of life." Id. at 1148; see also Pullen, 89 F.3d at 371 ("miserable family history" is not permissible basis for departure in average case). We emphasize that McBroom's "troubled childhood" is only relevant to its impact on his allegedly reduced mental capacity as an adult. McBroom's childhood experiences serve to place his volitional incapacity argument in context. It would be helpful to the sentencing court for McBroom's proffered experts, who report that McBroom suffers from a compulsion to view child pornography, to explain how that compulsion may have originated.

VII.

For the foregoing reasons, we will vacate the sentence imposed by the district court and remand for resentencing consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

36