**UNITED STATES of America**

v.

**Paul MOTTO.**

**No. CRIM. 99–297.**

United States District Court,
E.D. Pennsylvania.

Nov. 9, 1999.

---

Virgil Walker, Asst. U.S. Atty, Philadelphia, PA, for U.S.

John R. O'Donnell, Zarwin, Baum, Devito, Kaplan & O'Donnell, P.C., Philadelphia, PA, for Defendant.

### *MEMORANDUM*

DALZELL, District Judge.

On June 9, 1999, defendant Paul Motto pleaded guilty to distributing visual depictions of minors engaged in sexually explicit conduct, and receipt of visual depictions of minors engaged in such conduct, in violation of 18 U.S.C. § 2252(a)(1) and (a)(2), respectively. At his sentencing hearing which commenced on October 21, 1999 and concluded today, Motto contended that we should depart downward from the 70—87 month sentencing range because America Online ("AOL") "enabled" the offense and, pursuant to U.S.S.G. § 5K2.13, he suffered a "significantly reduced mental capacity" as our Court of Appeals has construed that Guideline policy statement in *United States v. McBroom,* 124 F.3d 533 (3d Cir. 1997).

Motto's two contentions implicate important questions that go to the core of criminal responsibility for sex offenders and in some respects for all offenders. We therefore must analyze Motto's arguments at some length. As this is a federal sentencing, these questions necessarily are addressed in the framework of the Sentencing Guidelines. As will be seen, a major issue this case raises within the Guidelines regime entails examining whether it is possible for at least half of the offenders of a particular offense to be outside the "heartland" of the guideline the Sentencing Commission has adopted for that offense.

*The Offense Conduct*

As detailed in the paragraphs of the presentence investigation report[1] dealing with the offense conduct (*see* ¶¶ 10–18 thereof), Motto, using the cybername FOXFOX99, in the summer of 1997 sent graphics files containing child pornography to the New York State Attorney General's undercover e-mail address. Based on the information received from the New York Attorney General's Office, the United States Postal Inspector in Philadelphia, also acting undercover, contacted Motto through AOL under the undercover cybername, BABYFACES54. Through an AOL chatroom, Motto and the Postal Inspector arranged that Motto would send a computer disk containing child pornography in exchange for a video containing the same sexually explicit material. Motto directed that the videotape be mailed to a post office box in Bensalem, Pennsylvania, to the attention of one "Bill Tate", Motto's pseudonym.

In September of 1997, Motto sent another e-mail in which he confirmed that he had sent a small package through the mails, that he could not wait for the video, and that he had "tons more stuff" when he got his materials (PSI ¶ 15). Motto on September 3, 1997 sent another e-mail to the undercover officer, and stated that he had sent a 3.5 disk, as well as eight to twenty-nine files as a show of good faith. A later review of the computer disk showed that it contained thirty graphics files, twenty-six of which containing child pornography involving children as young as six years old.

In late October of 1997, Motto arrived at the Bensalem Post Office and picked up an express mail package allegedly containing the video he had long sought. He was then followed to his residence in Bensalem, whereupon a federal search warrant was executed on the residence. Motto's computer system, computer disks and videos were seized.

*Record on Motto's Reduced Mental Capacity*

Just before his sentencing, Motto proffered the expert report of Timothy P. Foley, Ph.D., and Dr. Foley began his testimony at the sentencing hearing on October 21, 1999. At the request of the Government, Dr. Foley's direct testimony concluded, and the sentencing hearing was recessed in order to permit the Government to have Motto examined by an expert of its choosing. Cross-examination of Dr. Foley resumed on November 9, 1999. At that time, we also received the testimony of Timothy J. Michals, M.D., the Government's psychiatrist, who examined Motto on November 5, 1999 and submitted a report on November 8 (hereinafter "Michals Rep.").

In his written report, as well as in his testimony, Dr. Foley concluded that AOL "enabled" Motto's offense because of the "anonymous availability provided by the AOL chatrooms". Report of Timothy P. Foley, Ph.D. at 15 (hereinafter "Foley Rep."), attached as Ex. A to defendant's sentencing memorandum. Specifically, Dr. Foley wrote and confirmed in his testimony that:

> There are no indications of prior exposure to illegal pornography until receiving it as part of his [Motto's] AOL subscription. It is unlikely that Mr. Motto would have risked detection or have tolerated the anxiety of a face-to-face interaction to procure pornography. AOL enabled and interacted with Mr. Motto's psychopathology to produce the illegal behaviors for which he is charged.

*Id.*[2]

Although Dr. Foley's testing showed that Motto's responses provided "no indications of an antisocial personality disorder", Foley Rep. at 10, or "indications of sexual preoccupation", Foley Rep. at 11,

---

1. Motto did not object to any part of the August 25, 1999 revised presentence investigation report, and at the October 21 hearing we adopted the findings of that report.

2. In Motto's sentencing memorandum, begin-

and that his response to the test of an individual's sexual interests show "typical response[s] for heterosexual males", Foley Rep. at 12, he nevertheless concluded that Motto suffered from a Compulsive Personality Disorder within the meaning of § 300.3 of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) ("DSM–IV") and that his "compulsive personality disorder prevented him from exercising volitional controls over a behavior he knew was wrong." Foley Rep. at 14.

In his testimony on October 21, 1999, Dr. Foley disclosed that he had evaluated twenty-three men who had been charged in either the state or federal courts with child pornography offenses. He testified that all were, like Motto, white middle-class males. *See* Notes of Testimony of October 21, 1999 (hereinafter "Oct. 21 N.T.") at 74. He also acknowledged that no mature, well-adjusted adult would seek the material Motto received and distributed. Oct. 21 N.T. at 85–86. Of the twenty-three men Dr. Foley examined who had received child pornography, he estimated that at least half suffered from a personality disorder [3] within the meaning of DSM–IV. *See* Oct. 21 N.T. at 92.[4] In answer to

our question, Dr. Foley stated that the twenty-three men he saw constituted a representative sample, albeit not a randomly chosen one, of child pornography offenders like Motto. *See* Oct. 21 N.T. at 99–100.

Dr. Foley also confirmed, in response to our questions, that he believes AOL is, to some extent, responsible for what Paul Motto did in the summer of 1997. Dr. Foley is of the view that AOL, as well as other Internet online service providers, makes it "easier for everybody who has even the slightest curiosity" about such materials to get them because "[y]ou don't have to risk a face-to-face. You don't have to risk being observed." Oct. 21 N.T. at 84.

Dr. Michals, by contrast, concluded that Motto showed "no evidence of any mental disorder, which would have significantly reduced his mental capacity concerning the criminal charges that he is facing." Michals Rep. at 6.

*Can Half of a Class of Offenders Be Outside the Heartland of the Guideline for Their Offense?*

As Motto's expert, Dr. Foley on October 21 testified that offenders like Motto con-

ning at the fifth unnumbered page, he also decries the immunity Congress afforded providers like AOL by holding that they shall not "be treated as the publisher or speaker of any information provided by another information content provider." *See* § 230(c) of the Communications Decency Act of 1996, 47 U.S.C. § 230(c). In vigorous language with echoes from the class struggle, Motto writes, on the fifth unnumbered page of his Sentencing Memorandum,

> AOL is totally immune. It knows what garbage goes through its cyberspace and snares the Paul Mottos of the world. It could shut down its vile chat rooms with the flick of a switch but with immunity and swollen cash registers it allows weak people to get ever weaker in their [*sic*] privacy of their home.

In the case challenging the constitutionality of the "indecency" standard in the CDA, the plaintiffs made it "clear that they do not quarrel with the [CDA] to the extent that it covers obscenity or child pornography, which were already proscribed before the CDA's adop-

tion." *See ACLU v. Reno,* 929 F.Supp. 824, 865 (E.D.Pa.1996), *aff'd,* 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The plaintiffs in that case also did not challenge the exemption to which Motto takes such exception.

3. According to DSM–IV,

> A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment.
> DSM–IV at 629.

4. Our colloquy with Dr. Foley on this point was:

> Q. What percentage of those 23 in your view had a personality disorder?
> A. I think probably about half.
> Q. At least half.
> A. Yes, sir.
> Oct. 21 N.T. at 92.

stitute a very small percentage of criminal offenders. Reality bears this out. According to the Sentencing Commission's latest statistics, of the 49,815 offenders for whom a primary sentencing guideline can be identified in fiscal year 1998, only 149 had U.S.S.G. § 2G2.2 as the primary guideline, as in Motto's case. *See* 1998 Sourcebook of Federal Sentencing Statistics, Tbl. 17, 39–40 (United States Sentencing Commission 1998). Thus, for the fiscal year that ended September 30, 1998, such offenders constituted three-tenths of one percent of all federal offenders.

Against such a small universe, Dr. Foley agreed that a sample of twenty-three would be a significant size. *See* Oct. 21 N.T. at 100. As noted above, Dr. Foley also confirmed that, based upon his evaluations of these offenders, "possibly about half" or "[a]t least half" of these twenty-three suffer from a "personality disorder", as Motto allegedly does, within the meaning of DSM–IV.

5. This part of the Sentencing Reform Act of 1984 constitutes the only softening of the statute's rigor that is independent of the prosecutor's grace. It provides, in relevant part:

  **(b) Application of guidelines in imposing a sentence.**—The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

6. This policy statement provided at that time:

  **§ 5K2.13. *Diminished Capacity* (Policy Statement)**
  If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

■ These statistical realities naturally raise the question of whether such a large percentage of offenders can be so far outside the heartland of the sentencing guideline created for their offense that a departure is permissible under 18 U.S.C. § 3553(b)[5] and *Koon v. United States*, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) ("[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline.").

In its construction two years ago of U.S.S.G. § 5K2.13,[6] our Court of Appeals appeared to answer this question with a resounding "yes" in *United States v. McBroom*, 124 F.3d 533, 548 (3d Cir.1997). In *McBroom*, another child pornography case, a panel of our Court of Appeals held that a defendant may suffer from a "significantly reduced mental capacity" if either

(1) the person is unable to absorb information in the usual way or to exercise the power of reason; or

As Judge Ludwig pointed out in his perceptive opinion in *United States v. Bennett*, 9 F.Supp.2d 513, 525 (E.D.Pa.1998), *aff'd* 161 F.3d 171 (3d Cir.1998), *cert. denied* —— U.S. ——, 120 S.Ct. 61, —— L.Ed.2d —— (1999), § 5K2.13, a so-called "encouraged factor", co-exists with U.S.S.G. § 5H1.3, "Mental and Emotional Conditions", a "discouraged factor". U.S.S.G. § 5H1.3, in turn, provided in 1997, and still provides, that:

  **§ 5H1.3. *Mental and Emotional Conditions* (Policy Statement)**
  Mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure).
  Mental and emotional conditions may be relevant in determining the conditions of probation or supervised release; *e.g.*, participation in a mental health program (*see* §§ 5B1.3(d)(5) and 5D1.3(d)(5)).

*Bennett* comprehensively details the "problematical" consequences of this tension and of routinely applying DSM–IV "personality disorders" as predicates for downward departures. *See Bennett*, 9 F.Supp.2d at 525–26. *See also* text accompanying notes 8 and 9, *infra*.

(2) the person knows what he is doing and that it is wrong but cannot control his behavior or conform it to the law. *McBroom*, 124 F.3d at 548.[7] Applying this construction of § 5K2.13, *McBroom* held that the child pornography-receiving defendant could demonstrate a "significantly reduced mental capacity" because he suffered a DSM–IV "personality disorder", and therefore the sentencing court could exercise its discretion for a downward departure.

■ As far as the published report of *McBroom* shows, there was no record made in that case as to the pervasiveness of such "personality disorders" among the class of child pornography defendants like Motto and McBroom. But in view of the reality of the high incidence of this "personality disorder" among the defendants situated like Motto, *McBroom's* expansive language is puzzling at least as applied to child pornography defendants. Indeed, on the premise that "at least half" of the defendants who are subject to U.S.S.G. § 2G2.2 suffer a DSM–IV "personality disorder", it would seem that the Court of Appeals's reading of § 5K2.13 is irreconcilable with 18 U.S.C. § 3553(b) and *Koon*. Simply put, half of a class of offenders cannot be outside the heartland of the guideline for that offense. If anything, they *are* the heartland.

But this analysis is by no means confined to sex offenders. The synergy produced by wedding DSM–IV to § 5K2.13 would swallow up the heartland idea for all federal offenders. There is, after all, the DSM–IV category of "Antisocial Personality Disorder", generically defined as "a pattern of disregard for, and violation of, the rights of others." DSM–IV at 629. Absent the rare "minimal participant" under U.S.S.G. § 3B1.2(a)[8] involved in his very first offense, any defendant's lawyer would have no difficulty finding a "pattern" to establish this "personality disorder."[9] In short, criminals as a class suffer from "antisocial personality disorders," a point Dr. Foley himself made today. All under *McBroom* may therefore claim § 5K2.13's grace.[10]

7. *McBroom*'s definition led the Sentencing Commission to amend § 5K2.13, effective November 1, 1998 (after Motto's offense conduct) to add an Application Note that defines "significantly reduced mental capacity" as:

> *Application Note:*
>
> 1. For purposes of this policy statement— "Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

8. As the Sentencing Commission observes in Application Note 2 to § 3B1.2(a), "the downward adjustment for a minimal participant will be used infrequently." As will be seen in the following footnote, even "minimal participants" could easily show a "pattern" of antisocial indicia within DSM–IV's amazingly broad meaning of that word.

9. All it takes to qualify for a "pervasive pattern of disregard for and violation of the rights of others" under DSM–IV § 301.7 are

> three (or more) of the following:

(1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest

(2) deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure

(3) impulsivity or failure to plan ahead

(4) irritability and aggressiveness, as indicated by repeated physical fights or assaults

(5) reckless disregard for safety of self or others

(6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations

(7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

DSM–IV at 649–50.

These seven categories thus include bad manners, bad morals and other sins well short of crimes.

10. Of course, a critic of the Guidelines system could well applaud the elasticity a broad reading of § 5K2.13 gives. While reasonable

Although these realities and anomalies counsel against the application of § 5K2.13 to child pornographers like Motto, we are of course powerless to change what our Court of Appeals has held in *McBroom*.

### *On this Record, McBroom Affords Motto No Comfort*

It is true that *McBroom* does not on its face question *Koon*. Quoting *Koon* and its decision in *United States v. Sally*, 116 F.3d 76, 81 (3d Cir.1997), the *McBroom* panel stated that it relied "on the sentencing court's 'institutional advantage over appellate courts in'" determining when mental capacity is so "significantly reduced" as to warrant a downward departure. *McBroom*, 124 F.3d at 548 n. 13; *see also McBroom*, n. 17.

■ Taking *McBroom's* footnotes 13 and 14 at their word, and putting aside the reality, discussed above, that Motto is within the class of people who define the heartland of U.S.S.G. § 2G2.2 offenders, on this record we find that his mental capacity was neither "reduced" nor was that reduction, if it existed at all, "significant".

By comparison with Kenneth McBroom's life experience,[11] Paul Motto's life has been benign and almost *Pleasantville* normal. The presentence investigation report and the testimony at the sentencing hearing depict an ordinary middle-class American life. Motto was born and lived in a nuclear family in South Philadelphia, and the family relocated to Northeast Philadelphia when Motto was about ten

years old (PSI ¶ 48). His parents "have been married in excess of fifty years" (PSI ¶ 47), and he described a "happy childhood free from abusive behaviors" to his Probation Officer (PSI ¶ 48).

Motto has been married since 1985 to the former Lisa Thompson, who has borne him three sons. The family lives in "a nicely-furnished and well-kept townhouse in Bensalem, Pennsylvania ... with ample space and a small yard" (PSI ¶ 51). Motto actively supports, and sometimes coaches, his sons' soccer and hockey.

After graduating from high school, Motto started working in landscaping, and in 1989 formed Keswick Landscaping, Inc. in Trevose, Pennsylvania. He has run Keswick ever since, and the firm now employs four people (PSI ¶ 60).

At the October 21 sentencing hearing, his neighbors consistently portrayed an extraordinarily trustworthy individual. Indeed, one neighbor described the "open-door policy" she and her family have with the Mottos, where each family "literally walk[s] in" to the other's house unannounced. Oct. 21 N.T. at 23–24.

Paul Motto's brother, Michael, testified that their parents provided "a loving relationship", Oct. 21 N.T. 28–29, that nevertheless, from time to time, involved a spanking if any child broke family rules. He specifically denied, however, any "abnormal" physical abuse. Oct. 21 N.T. at 30. When Motto's counsel asked whether "it would be fair to say that your parents were tough disciplinarians", Michael Motto answered:

---

observers may encourage any expansion of the sentencing judge's discretion to escape the Sentencing Reform Act's discipline, it would seem that such readings would inevitably lead to a wink and nod sentencing world that is antithetical to the transparency that the 1984 Act gives to federal sentencing. While conceding that Congress has still not given us the best of all possible sentencing worlds, we have elsewhere written of the virtues of the completely visible results when judges are subject and faithful to the Guidelines regime. *See* Stewart Dalzell, *One Cheer for the Guidelines*, 40 Vill. L.Rev. 317, 333 (1995).

**11.** *See McBroom*, 124 F.3d at 535. Lurid as this account of Kenneth McBroom's childhood was, its source was only McBroom himself. This distinction between objective and subjective reality is not lost on Dr. Foley, *see* Oct. 21 N.T. at 64–65. While reliance on subjective reports may suffice for psychotherapy, it is quite another matter to apply it to the law, a discipline well-acquainted with the perils of pure subjectivity.

By contrast, McBroom's reports of alcohol and cocaine addiction were readily verifiable. *See United States v. McBroom*, 991 F.Supp. 445 (D.N.J.1998)(on remand).

That may be an accurate assessment, but you still, you got to classify what's "tough disciplinarian." It's not like a military Boot Camp. Every family has rules.

Oct. 21 N.T. at 32.

Lisa Motto, Paul's wife, described him as "the best father a man could be to children" and "as a husband, he's every girl's dream." Oct. 21 N.T. at 35. When the Government's lawyer asked her whether Motto "ever told you that he's ever been abused, either emotionally or physically, by anyone", Mrs. Motto replied:

I think "abuse" is a fine word.

I don't feel that he has been abused. I feel that he has had a very strict upbringing in the respect of girls, which made Paul very backward.

I was his first love, and he was hesitant to bring me home to his parents, because nobody was good enough for their Paul.

Oct. 21 N.T. at 44.

In his report and testimony, Dr. Foley picked up on the "very strict upbringing" theme and found in it the predicate for the DSM–IV "personality disorder" that he diagnosed in Paul Motto. For example, at page 7 of his report, Dr. Foley records that, for Motto, "sex was a 'dirty proposition' given his Roman Catholicism and his parent's [sic] strict controls over him." Foley Rep. at 7. Thus, Motto allegedly refrained from dating girls at the age of thirteen and fourteen, and Dr. Foley felt that it was "unusual that an adolescent does not test" such a parental limit. Oct. 21 N.T. at 63. It is worth noting that,

notwithstanding these "strict" parental limits, Motto "admitted to chronic marijuana use between the ages of seventeen and twenty-two" and experimented "with alcohol at the age of 'fourteen or fifteen' ", Foley Rep. at 8; see also Oct. 21 N.T. at 66.

Dr. Foley concluded, at page 13 of his report, that

Mr. Motto compulsively used pornographic images as a form of relief from the stresses of his job, marriage, and family.... His pornographic involvement stems from thwarted adolescent sexual desires deferred in an effort to please his over controlling parents. His fantasies involved becoming sexually active with an adolescent, as an adolescent. Assuming the adolescent persona in fantasy allowed him to escape the aversive realities of adult life.

See also Oct. 21 N.T. at 85 ("he was, in my estimation, going back to a time when sexual behaviors were prohibited by his parents and sort of acting-out what he didn't do when he was 13 or 14.").

It is worth observing, notwithstanding the reference to "the adolescent persona in fantasy", that Dr. Foley himself notes that the materials that Motto pleaded guilty to receiving involved sexual activities with male and female children as young as six.[12] Dr. Foley's diagnosis is that Motto "was suffering from Compulsive Personality Disorder (DSM–IV–300.3) during the commission of his offense"[13] and that his "compulsive personality disorder prevented him from exercising volitional controls over a behavior that he knew was wrong", Foley Rep. at 13–14.

---

12. In his summary of "the seized pornographic materials" at page 4 of his report, Dr. Foley writes:

The thirty still images were various pornographic depictions of pre and post-pubescent males and females. Several of the images involved children less than six years of age. One of the images was a sadomasochistic depiction of a pre-pubescent female child.

13. The diagnostic criteria for this "personality disorder" are:

Obsessions are defined as:
(1) recurrent and persistent thoughts, impulses, or images that are experienced, at some time during the disturbance, as intrusive and inappropriate and that cause marked anxiety or distress[;]
(2) the thoughts, impulses, or images are not simply excessive worries about real life problems.
(3) the person attempts to ignore or suppress such thoughts, impulses, or images, or to neutralize them with some other thought or action[;]

With all deference to Dr. Foley, we cannot find on this record that Motto suffered from any "reduced mental capacity" within the meaning of U.S.S.G. § 5K2.13. As set forth in great detail above, with the exception of his interlude in the summer of 1997 receiving and distributing child pornography, Paul Motto has in every other respect led a completely normal and, in many ways, exemplary life. The "strict" upbringing he received, grounded in his family's Roman Catholicism, cannot be regarded as so extraordinary as to take this defendant out of the heartland. Notwithstanding Motto's attempts to criticize his parents' upbringing of him, there is nothing in this record to suggest that they did anything more than any parents, of whatever religious faith, do when they teach their children right and wrong and that limits indeed exist that all civilized people must observe. It is, in fact, rather eyebrow-raising to hear the suggestion that there is something "abnormal" about parents discouraging sexual activity from thirteen- and fourteen-year old children.

To reiterate the point made in our analysis of *McBroom*, it takes no demographer or poll taker to conclude that tens of millions of Americans have "suffered" from an upbringing very much like Paul Motto's. By Dr. Foley's definition, such "victims" are all candidates for downward departures under U.S.S.G. § 5K2.13 should they break the federal criminal law.

Even if we were to accept that there was something in Paul Motto's life experience or personality that gave him a "reduced mental capacity", on this record we cannot regard that reduction as significant. Unlike Kenneth McBroom, with the exception of the offense itself—which by statistical definition is so extraordinary as to exist in only three out of a thousand federal offenders—Paul Motto's "disorder" has in no other way impaired any aspect of his life. Again, to hold that the totality of this record supports a "significantly reduced mental capacity" would necessarily mean that any similarly-situated sex offender should win the grace of § 5K2.13. Putting aside the extravagance of such a conclusion in general, *see* discussion of *McBroom* as applied to this class of offenders, *supra*, it does not apply to this particular defendant on the record as we found it in two days of testimony.

We therefore deny the motion for downward departure under § 5K2.13.[14]

*What, If Any, Sentencing Significance Should Be Given to AOL's "Enabling"?*

■ In Dr. Foley's monograph attached to Motto's Sentencing Memorandum, he

---

(4) the person recognizes that the obsessional thoughts, impulses, or images are a product of his or her own mind (not imposed from without as in thought insertion).

Compulsions are defined as:

(1) repetitive behaviors or mental acts that the person feels driven to perform in response to an obsession or according to rules that must be applied rigidly.

(2) the behaviors or mental acts are aimed at preventing or reducing distress or preventing some dreaded event or situation; however, these behaviors or mental acts either are not connected in a realistic way with what they are designed to neutralize or prevent or are clearly excessive[.]

At some point during the course of the disorder, the person has recognized that the obsessions or compulsions are excessive or unreasonable.

The obsessions or compulsions cause marked distress, are time consuming (take more than one hour per day), or significantly interfere with the person's normal routine, occupational functioning, or usual social activities or relationships. (DSM–IV, ¶.422–423).

Quoted in Foley Rep. at 13–14.

**14.** As Judge Ludwig mentions in *Bennett, see supra* note 6, there are inherent problems with giving legal consequence to DSM–IV personality disorders. As Judge Ludwig points out,

However, many clinicians do not believe a personality disorder is more than a narrative description of one's personality. They therefore distinguish it from a mental disease or disability and would reject it as a basis for a societal or legal judgment.

*Bennett*, 9 F.Supp.2d at 526–27 (citing, among other authorities, the views of the Fourth, Sixth and District of Columbia Cir-

quotes at length from *McBroom* regarding Kenneth McBroom's discovery of the Internet and its "wealth of pornography" including "pornography of types [he] had never before seen … includ[ing] child pornography, bestiality, masochism, bondage and every imaginable sexual fetish." *See McBroom*, 124 F.3d at 536–37. "When I wasn't sitting at the computer looking at this stuff, I was thinking about looking at it." *Id.* at 537. In his Sentencing Memorandum, Motto's counsel links his client to this depiction of McBroom in Dr. Foley's monograph:

> Dr. Foley further reported that pornography is the most frequently searched Internet available material. A weak person need not leave the comfort and privacy of his computer room to indulge in all types of fantasy which otherwise would be prohibited by inhibition.

Def.'s Sentencing Memorandum at sixth unnumbered page.

This equation of Kenneth McBroom and Paul Motto, in the section entitled "American [*sic*] On Line As An Enabler", would seem to suggest that this "enabling" is itself a reason for a downward departure, perhaps under U.S.S.G. § 5K2.0.[15] Even aside from the analysis set forth above, we reject such a contention out of hand. To craft a routine downward departure for all federal sex offenders who access the Internet would do violence to the "heartland" keystone of the federal sentencing regime,

leavened by 18 U.S.C. § 3553(b) and *Koon*.[16] As the Internet grows at the extraordinary, exponential rate that already makes it available in tens of millions of households, granting downward departures because of offenders' access to sexual images would necessarily afford departures to sex offenders who claim to have been stimulated by *Sex in the City* or other sexually oriented network television programs, or who were titillated by watching R- or NC–17–rated films.

In short, in a society as drenched with sexual images as ours is, it would be child's play for advocates of sex offenders to find *some* "enablers" in the life experiences of their clients. The presence of such "enablers" thus cannot serve as a predicate for § 5K2.0 downward departures, absent "extraordinary" idiosyncrasies not present here.

It is equally difficult to see how AOL's role as "enabler" should even be a mitigating factor within the applicable sentencing range. As we would not mitigate the sentence of another sex offender who, say, read with interest *The Story of O* or *The Story of Juliette*, so we do not mitigate in Motto's case because of the presence of a business whose work is considerably more chaste than that of Paulino Réage or the Marquis De Sade. AOL's role, if any, as "enabler" is therefore of no sentencing moment.[17]

### *"Sense of Proportion"*

■ The last three pages of Motto's sentencing memorandum are devoted to

---

cuits). *See also* our analysis, *supra*, in the text accompanying notes 8 and 9 that shows that criminals are, almost without exception, "suffering" from the "antisocial personality disorder" of DSM–IV § 301.7.

**15.** It is rather clear that Motto and his counsel use the word *enable* in some pop therapeutic sense. Notably, the word does not appear in the index of DSM–IV. The closest dictionary meaning we can find to what Motto seems to try to convey with this word is "[t]o make possible or easy", V *The Oxford English Dictionary* 201, def. 5a (2d ed. 1989). As applied to criminal responsibility—much less criminal sentencing—such a meaning has

such boundless plasticity that it means everything and nothing, as witness its use in the sentence, "The axe maker *enabled* Lizzie Borden to chop up her parents."

**16.** It would also be contrary to the explicit command of U.S.S.G. § 2G2.2(b)(5), which *enhances* two offense levels "[i]f a computer was used for the transmission of the material", *i.e.*, if the offender used the Internet.

**17.** Without the vigor with which he pressed the "enabler" argument, Motto's counsel at the hearing today proffered, as another basis for a downward departure, Motto's "extraor-

giving us a "[s]ense of proportion" to Motto's crimes by measuring them against other child pornography sentences in the state and federal courts. He does so by proffering eight news articles about the sentencings in these cases. *See* Sentencing Memorandum, Tab G. For example, he offers an Associated Press dispatch, published in the April 28, 1999 *Philadelphia Daily News,* "Episcopal priest jailed for kiddie porn", reporting the eleven to twenty-three month sentence meted out in Montgomery County, Pennsylvania, Common Pleas Court to the rector-defendant who accessed child pornography on the parish computer.

Whatever the justness of those other sentences on their particulars, the fact remains that Motto's sentencing range was without objection located on the sentencing grid at 70 to 87 months.[18] Harsh as this calculus may well seem to Motto, his supporters, and perhaps many others of good faith, Motto's exception to this heartland range is in the end with the Sentencing Commission and, through it, with Congress.[19]

### ORDER

AND NOW, this 9th day of November, 1999, upon consideration of defendant's motion for downward departure, and after a sentencing hearing on October 21, 1999 and this day, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that the motion is DENIED.

dinary post-conviction rehabilitation efforts" under *United States v. Sally,* 116 F.3d 76, 79–82 (3d Cir.1997). There is nothing in this record that would warrant such a downward departure under *Sally,* and so we decline to do so.

**18.** Motto's base offense level of **17** was enhanced five levels because he distributed child pornography (PSI ¶ 25), two levels because the material involved prepubescents such as the female performing oral sex on an infant male (PSI ¶ 24), and four levels because the material portrayed sadistic or masochistic conduct (PSI ¶ 26). As noted *supra* note 16, two levels were also added because Motto used a computer (PSI ¶ 27). Absent these enhancements, Motto's sentencing range would have been 24—30 months, well within the "sense of proportion" sentences Motto proffered us.

**19.** While Motto and his family and many friends will surely find our analysis to yield a harsh result, perhaps after some of the sting passes they will come to recognize that it is driven by Congress's judgments that similarly situated defendants should be treated equally and that receiving and distributing child pornography are not victimless crimes. In this latter regard, even Motto's expert, Dr. Foley, "[a]bsolutely" supports Congress's decision to criminalize trafficking in child pornography. *See* Oct. 21 N.T. at 76.

Perhaps Motto and his friends will also some day see that our decision not to depart downward in his case stems from our regard for him, based upon the record before us, as a responsible adult whose life aside from this tawdry episode justly earned him the broad and warm support voiced at his sentencing.