**UNITED STATES of America,**

v.

**Carylyn SHORE, Defendant.**

**No. 00–CR–10196.**

United States District Court,
D. Massachusetts.

April 11, 2001.

Francis J. DiMento, DiMento & Sullivan, Boston, MA, for defendant.

Stephen G. Huggard, Boston, MA, United States Attorney.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

Defendant Carylyn Shore ("Shore") pled guilty to a one count felony information charging her with "corruptly endeavoring to impede the administration of the Internal Revenue laws," in violation of 26 U.S.C. § 7212(a).[1] The charges stem from an IRS investigation of certain trusts for which Shore was the trustee. During a civil audit that began in 1993, Shore was questioned orally and in writing, and she did not answer truthfully.[2] After the criminal investigation started, but before charges were brought, Shore filed a truthful tax return and paid all arrearages.

The United States Probation Department calculated a Total Offense Level of 12, with criminal history Category I, yielding a guideline range of 10 to 16 months. The government sought a sentence of 10 months—at the low end of the guideline range.

Shore moved for a downward departure from an offense level of 12 to a level of 8, based on the following grounds: (1) Dimin-

---

1. That statute provides:

   Whoever corruptly ... endeavors to ... impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly ... obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both.... 26 U.S.C. § 7212(a).

2. The information to which Shore pled specified a number of allegedly unlawful acts as part of the charge of "corruptly endeavoring to impede the administration of the Internal Revenue laws." During the plea colloquy, however, Shore did not agree that she had committed all of the acts alleged. She agreed only that she "made, and caused others to make, material misrepresentations to agents of the Internal Revenue Service with regard to her business affairs and sources of income." Tr. of plea colloquy, June 28, 2000, at 17.

ished capacity under U.S. Sentencing Guidelines Manual[3] §§ 5K2.13 and 5H1.3, stemming from her history of severe depression and post-traumatic stress disorder, which impaired her ability to understand the wrongfulness of her behavior and to control her acts; (2) aberrant conduct; and (3) various circumstances removing her offense conduct from the "heartland" of cases covered by the relevant guideline, § 2T1.1.

In essence, the defendant asked this Court to construe her offense narrowly, considering only the specific false statements she made during the civil audit. In contrast, she requested that the Court consider her state of mind broadly, taking into account her deep and long-standing depression and post-traumatic stress disorder (occasioned by the sudden death of her twelve-year-old daughter from a particularly deadly form of leukemia), her husband's alcoholism, her dysfunctional relationship with her son, and her suicide attempt on the eve of proceedings in this case. The government advocated the opposite perspective: It asked the Court to construe Shore's offense broadly, as part of a pattern of asset concealment that began long before the civil audit, but to consider her state of mind narrowly, and indeed, critically. In essence, the government described Shore as a canny businesswoman rather than a seriously impaired human being. In addition, the government raised procedural objections to Shore's requested sentencing departures.

Based on Shore's medical records, the report and testimony of Dr. Marc A. Whaley, M.D. ("Dr. Whaley"), and the briefs of counsel and sentencing arguments held over two days, I agreed with the defendant that a downward departure was appropriate under § 5K2.13. I therefore sentenced Shore to two years of probation, four months of which were to be spent in home detention with electronic monitoring, and a fine of $30,000.

This memorandum provides the basis for my sentencing decision, which was first announced at the sentencing hearing on February 14, 2001.[4] I address the government's procedural concerns first, then the nature of Shore's offense, and then the departure question.

## I. PROCEDURAL CONSIDERATIONS

In addition to its substantive argument, discussed below, the government opposed Shore's departure motion on procedural grounds. It maintained that the defendant did not preserve her right to make such a motion under the plea agreement, and also that she erred in failing to move formally for a departure.

While I agreed with the government with respect to Shore's preservation of her aberrant conduct argument,[5] I did not agree that she failed to preserve her diminished capacity argument. The proce-

3. All subsequent section numbers refer to the U.S. Sentencing Guidelines Manual, unless otherwise indicated.

4. As is my wont, I will not execute the judgment until after this opinion issues, to give the parties the full benefit of their appeal rights.

5. A defendant is barred from making arguments not reserved in his or her plea agreement. Having bargained for defense concessions and given up its own claims by, for example, allowing the limitations period to run with respect to certain accusations, the government is entitled to rely on those concessions. The Court, however, is not bound by the parties' agreement.

Nevertheless, I did not consider the question of aberrant conduct in sentencing Shore, both because I was concerned about the unfairness to the government of the circumstances under which Shore raised the issue, and because I concluded that the diminished capacity argument was meritorious.

dural order I entered on June 28, 2000, did not require a formal departure motion, as the government implied. The order simply requested submission of a "memorandum supporting any recommendations as to ... a departure from the guideline range." The defendant filed such a memorandum at the appropriate time (indeed, she filed several memoranda), and she included her departure arguments in her formal objections to the presentence report. In addition, her plea agreement reserved her "right to argue for a downward departure based [exclusively] upon [her] psychiatric condition." Finally, Shore ultimately did file a formal departure motion under § 5K2.13, though admittedly, this motion was not filed until after the government had objected to its absence.

In any event, to make up for any inconvenience caused by the procedural circumstances, I gave the government additional time to secure and review the medical records of Shore's suicide attempt. At the sentencing hearing, the government agreed that it had had an opportunity to speak with Shore's psychiatrist and to review her medical records. Tr. of sentencing hr'g., Feb. 14, 2001, at 9.

As there is no procedural failing in Shore's motion for a departure under § 5K2.13, I proceed to describe her offense and consider the merits of her departure argument.

## II. THE NATURE OF SHORE'S OFFENSE

Shore's guilty plea is quite narrow in scope. She admits to a limited number of misrepresentations to IRS agents who conducted a civil audit in 1993 and 1994.[6] Her admitted misrepresentations relate to (1) the structure of certain trusts, (2) the disposition of one of the assets in the trust—a boat, Sea Genie, which was not in drydock as Shore reported, but was instead earning income; and (3) the total income from a cash parking lot Shore operated near the Martha's Vineyard ferry terminal. Had Shore been fully honest, the IRS would have discovered that Shore's son Cord was the beneficiary of the trusts, that the Sea Genie earned approximately $300,000 per year in 1991, 1992, and 1993, and further, that $355,000 in parking lot receipts went unreported.

Although Shore's misrepresentations are limited in scope, the government alleged they constituted only a small part of a larger scheme. In its initial charging papers, its recitation of the facts at the time of the plea, and the "offense conduct" portion of the presentence report, the government claimed that "more" is at issue than the admitted false statements. In fact, it suggested that Shore had "a very lengthy history of conducting her business affairs in a way most likely to keep the Internal Revenue Service ("IRS") from learning her income."[7] In support of this suggestion, the presentence report, quoting the government, referred to Shore's unreported deeds, her largely cash parking lot business, and her assets held in trusts and corporations.

I did not, however, consider these broader allegations in determining the appropriate sentence for Shore's admitted wrongdoing. Though the government's various submissions hinted at tax evasion, this

---

6. These facts are found in paragraphs 14 and 15 of the presentence report.

7. This is a quote from the presentence report, but it is clear that probation simply quoted the "statement of the offense" submitted by the government, rather than conducting its

own independent investigation. As the government's wider accusations are irrelevant to a determination of relevant conduct under the Guidelines, it is not surprising that probation did not investigate further.

broader crime was neither charged nor litigated. Indeed, counsel for the government concedes that such a claim would be difficult to prove.[8] Additionally, after Shore filed corrected returns and paid the tax deficiency, the IRS did not even seek delinquency penalties for negligent failure to file.

Accordingly, as the government's broader claims did not meet even the preponderance-of-the-evidence standard, my sentencing decision focuses only on the misrepresentations to which Shore pled guilty.

## III.  DIMINISHED CAPACITY

I turn now to the merits of Shore's request for a downward departure.

Section 5K2.13 provides that a sentence below the applicable guideline range "may be warranted" if the defendant committed a non-violent offense "while suffering from a significantly reduced mental capacity." It continues, "[i]f a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." *Id.*

### A.  Background of § 5K2.13

One cannot understand the import of § 5K2.13 without briefly considering the legislative history of the provision. Concerned that sentencing based on different offender characteristics accounted in part for unwarranted sentencing disparities among courts, the drafters of the Sentencing Reform Act of 1984 [9] directed the United States Sentencing Commission to "consider whether the following matters, among others, with respect to a defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and [to] take them into account only to the extent that they do have relevance." 28 U.S.C. § 994(d). Included in the list of factors for the Commission to evaluate was a defendant's "mental and emotional condition" to the extent it mitigates culpability or is otherwise "plainly relevant." *Id.* § 994(d)(4).

In accordance with these instructions, the Commission promulgated § 5H1.3, a policy statement that indicates, "mental and emotional conditions are not *ordinarily* relevant in determining whether a sentence should be outside the applicable guideline range." § 5H1.3 (emphasis added).[10] Adoption of this policy represented a major change in course in criminal law, as it devalued the importance of *mens rea*—an element that had been an important factor in sentencing for more than a century.[11]

The scope of this change in course is not, however, immediately clear from the text of the policy statement. Nowhere in the Guidelines themselves, nor in the interpretive material, is there any indication of what extraordinary circumstances render mental and emotional conditions relevant.[12]

---

8.  Apparently, the government did not charge tax evasion, in spite of the large sums due and owing, because the situation is complex and involves a number of entities and individuals, each likely to point to the others as being responsible for the taxes.

9.  Codified as amended at 18 U.S.C. § 3551 et seq. and 28 U.S.C. §§ 991–998.

10.  Section 5H1.3 is a policy statement rather than a guideline. In *Williams v. United States*, however, the Court held that under

some circumstances, policy statements are an authoritative guide to interpreting the Guidelines. 503 U.S. 193, 201, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992).

11.  Jack B. Weinstein, *The Denigration of Mens Rea in Drug Sentencing*, 7 Fed.Sent.R. 121 (1994).

12.  I raised a similar issue in *United States v. Thompson* in connection with departures under § 5H1.6 for extraordinary family obligations:

In effect, the Guidelines recognize that the decision is fact-bound, and therefore impossible to codify.

■ The only other reference to mental condition in the Guidelines occurs in the provision at issue here: § 5K2.13, a policy statement dealing with "diminished capacity." Broader than § 5H1.3, § 5K2.13 encourages a departure for a mental condition that "significantly" impacts the mental capacity of a non-violent offender and "contribute[s] to the commission of the offense." *Koon v. U.S.*, 518 U.S. 81, 92–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting that the Guidelines categorize factors which might constitute grounds for downward departure as: (1) Prohibited;[13] (2) discouraged;[14] (3) encouraged;[15] and (4) not mentioned[16]); *accord United States v. McBroom*, 124 F.3d 533, 538 (3d Cir. 1997) ("The factors contained in subpart 5K2 are the so-called 'encouraged factors.'").

During the 1998 amendment cycle, the Commission broadened § 5K2.13. Significantly, for the issues raised in this case, the Commission extended the departure ground to include volitional impairment, in addition to cognitive impairment.[17]

---

The question raised by this case is what these concepts mean. What is the standard by which to judge "extraordinary" family obligations or an "extraordinary" work history? What class of defendants define "ordinary"? While the Sentencing Commission and the case law offer little guidance on the subject, one thing is clear: The baseline is not, nor should it be, "Ozzie and Harriet," the fictional two parent, two child, suburban home. In a sentencing regime whose aim is to eliminate unwarranted disparities between similarly situated offenders, "ordinary" should be determined by comparing this defendant with others convicted of the same crime. *Thompson*, 74 F.Supp.2d 69, 70 (D.Mass. 1999).

The First Circuit reversed this decision on the grounds that the scope of comparison should not extend only to similarly situated offenders (that is, those convicted of the same offense), as the statute requires, 28 U.S.C. § 991(b)(1)(B) (charging the Commission with setting guidelines to "avoid unwarranted sentencing disparities among defendants with similar records *who have been found guilty of similar criminal conduct*" (emphasis added)), but rather to all offenders convicted of all offenses. *United States v. Thompson*, 234 F.3d 74, 78 (1st Cir.2000).

**13.** The Commission lists certain factors that may never be considered for departure, including the individual's race, sex, national origin, creed, religion, socio-economic status, § 5H1.10; lack of guidance as a youth, § 5H1.12; drug or alcohol dependence, § 5H1.4; and economic hardship, § 5K2.12. *Accord Koon*, 518 U.S. at 93, 116 S.Ct. 2035.

**14.** Discouraged factors are those "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." U.S.S.G. ch. 5, pt. H, Introductory commentary. Examples include family ties and responsibilities, education and vocational skills, and military, civil, charitable or public service record. *See Koon*, 518 U.S. at 95, 116 S.Ct. 2035.

**15.** Encouraged factors are "'those the Commission has not been able to take into account fully in formulating guidelines.'" *Id.* at 94, 116 S.Ct. 2035 (citing § 5K2.0).

**16.** If a factor is "unmentioned" in the Guidelines, a court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," decide whether the factor is sufficient to take the case out of the Guidelines "heartland." *Id.* at 95, 116 S.Ct. 2035.

**17.** This change parallels the Third Circuit's decision in *McBroom*, 124 F.3d at 546. In *McBroom*, the defendant, a practicing lawyer and recovering alcoholic and cocaine addict, pled guilty to one count of possession of child pornography. He recounted a traumatic history of child sexual abuse, alcohol and cocaine addiction, and obsession with pornography. While he managed to practice law, he continuously abused alcohol and cocaine, frequented "peep shows," and viewed pornographic pictures. After treatment, he stopped drinking and taking drugs, but he turned to

The new standard, "significantly reduced mental capacity," is now defined in the Application Note following § 5K2.13 as, "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offence or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." [18] § 5k2.13, cmt. n. 1.

■ In addition, the amended guideline mandates that a court find that the "significantly reduced mental capacity ... contributed," at least to some degree, "to the commission of the offense." This does not, however, require that the condition be the but-for or sole cause of the offense. *McBroom*, 124 F.3d at 548 n. 14; *accord United States v. Cantu*, 12 F.3d 1506, 1515 (9th Cir.1993) ("Although the issue has never arisen in our circuit, other circuits are unanimous in holding that the disorder need be only a contributing cause, not a but-for cause or a sole cause, of the offense," (citing, among other cases, *United States v. Soliman*, 954 F.2d 1012, 1014 (5th Cir.1992); *United States v. Lauzon*, 938 F.2d 326, 331 (1st Cir.1991))).

Plainly, the "diminished capacity" standard implies a comparison with the usual defendant—the typical offender, whose "mental capacity" is not substantially impaired. The guideline language indicates, however, that the standard does *not* require a finding that the defendant's impair-

ment is somehow extraordinary, unique, or outside of the heartland, as those terms have been understood elsewhere in the Guidelines. Rather, the standard focuses only on the case at hand, unlike the departures in Chapter 5H, which involve comparisons with other defendants. Had the Commission intended to require a broader inquiry, it would have indicated that "diminished capacity" is "not ordinarily relevant"—suggesting that the facts must be "extraordinary" to justify departure—as it did in discussing educational and vocational skills, § 5H1.2, physical conditions, § 5H1.4, and employment record, § 5H1.5.

Further, those sections of chapter 5K that include language mandating a broader, more comparative analysis of the defendant's conduct or character describe sentencing factors that may also be aspects of the offense of conviction. For example, the Commission suggests that for an offense such as obstruction of justice, a sentencing departure for "disruption of government"—which is "inherent in the offense"—is only warranted if the circumstances are "unusual," § 5K2.7, or the disruption in question occurred "to a degree substantially in excess of that which ordinarily is involved in the offense." § 5K2.0. In contrast, in most cases involving "diminished capacity," the applicable offense is not defined in the Guidelines with reference to the defendant's mental capacity.[19]

the Internet to download child pornography. The Third Circuit concluded that § 5K2.13 included both cognitive impairments (that is, inability to understand the wrongfulness of the conduct or to exercise the power of reason) and volitional impairments (that is, inability to control behavior that the person knows is wrongful). *McBroom*, 124 F.3d at 546. On remand, the sentencing court found that McBroom's situation justified a downward departure under the volitional prong of § 5K2.13, due to McBroom's obsessive compulsive disorder. *United States v. McBroom*, 991 F.Supp. 445, 450–51. *See* Alan Ellis,

*Answering the 'Why' Question: The Powerful Departure Grounds of Diminished Capacity, Aberrant Behavior, and Post–Offense Rehabilitation*, Federal Sentencing Reporter, May/June 1999.

18. The applicable Guidelines in this case are those in effect as of November 1, 1998, which include the amended § 5K2.13.

19. This description applies to the applicable offense in this case: the definition of tax evasion makes no reference to the defendant's mental capacity. § 2T1.1(a).

Nothing in ch. 5 would call for a showing of unusually or substantially diminished capacity before invoking § 5K2.13. Furthermore, the final sentence of § 5K2.13 eschews comparison with other offenders, calling instead for a departure that reflects *only* "the extent to which the reduced mental capacity contributed to the commission of the offense."

█ The final, and possibly most persuasive rationale for conducting only a narrow, fact-specific inquiry in applying § 5K2.13 relates to the nature of the sentencing factor in question: § 5K2.13 describes one of the few departure factors that substantive criminal law also recognizes as a partial or full defense to a crime.[20] Kate Smith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 74 (1998). In describing other departure factors, the Guidelines frequently either explicitly redefine terms in common use in the substantive criminal law, or invent new concepts, largely without explanation. *Id.* at 96. Nothing in the text of § 5K2.13 or elsewhere in the Guidelines, however, suggests that the Commission intended to redefine the term "diminished capacity." Thus, the term should be applied in sentencing just as it is applied in substantive criminal law—in a narrow inquiry that avoids comparison with other defendants to determine if a particular defendant's mental capacity is uniquely or extraordinarily "diminished." *E.g. United States v.*

*Fishman,* 743 F.Supp. 713, 721—22 (N.D.Cal.1990) (discussing the defense of "diminished capacity").[21]

## B. *Application of § 5K2.13 to Shore's Offense*

█ Thus, to depart under § 5K2.13 in this case, I had to evaluate the following issues in a focused inquiry, limited to the specific facts of Shore's offense: What is the nature of Shore's psychiatric problem? Does the problem amount to a "significantly reduced mental capacity" in either the volitional or cognitive sense? Was the problem in evidence at the time of offense? Did the problem "contribute[ ]" to the commission of the offense?

### 1. *The Nature of Shore's Psychiatric Condition, and Its Impact on Her Actions*

Dr. Whaley, a psychiatrist with appropriate and unchallenged credentials,[22] and an entirely credible witness, described Shore as suffering from a major depressive disorder and post traumatic stress syndrome, deriving from "years of intense grief" since the death of her 12–year–old daughter from incurable leukemia in 1982. According to Dr. Whaley, the manifestations of Shore's condition included "severe emotional numbness, a preoccupation with a loss, [and a] heightened sense of anxiety and distress when faced with anything uncertain especially having to do with her

20. Other examples of such factors include provocation by the victim, and legal coercion or duress. §§ 5K2.10, 5K2.12.

21. Other judges of this Court have apparently used a similar definition of the guideline term "diminished capacity." In *United States v. Fulton,* for example, the court found that the defendant "suffer[ed] from diminished mental capacity deriving from vulnerability traceable in part to childhood abuse and in part to more recent traumatic experiences." 960

F.Supp. 479, 497 (D.Mass.1997). In reaching this conclusion, however, the court did not make any finding that the defendant's mental incapacity was in any way "unique" or "extraordinary."

22. In addition to his training at Tufts University Medical School, Dr. Whaley has forensic experience as a consultant to the treatment center at MCI Bridgewater and as a court psychiatrist in the Dedham courts.

family." Apparently, Shore felt deep psychological guilt for failing to find the "right" doctor and treatment for her daughter, even though, given the nature of the disease, any action would probably have been futile.

Although her daughter's death occurred some time ago, Shore never sought the psychological help she needed. In the intervening time, dysfunctional relationships with her husband and son exacerbated her mental problems. Her husband suffered from cardiac and pulmonary disease, as well as other periodic illnesses, and he has had a significant alcohol problem, which culminated in a serious car accident. Shore's son, now 34, behaved irresponsibly in a number of ways. After the death of her daughter, Shore focused on protecting her son—treating him as a child, Dr. Whaley opines, as a way to hold on to her daughter. Shore apparently sees herself as the sole responsible party in the family, trying to hold up the rest in a kind of "living death" as Dr. Whaley put it.

In May 2000, Shore's depression drove her to attempt suicide. After the attempt, she was hospitalized for eight days at Massachusetts General Hospital ("MGH") and then at McLean's Hospital.

With respect to the instant charges, Dr. Whaley represented that in 1993 and 1994, during the IRS civil audit, Shore probably reacted instinctively to questions about her son Cord's trust. Dr. Whaley concluded that Shore's mental capacity was "significantly reduced" at the time, making it difficult for her to deal with "detailed complicated matters, sorting out the pros and cons of disclosing this or answering a question in this way or that." Rather than focusing on producing the information requested by the IRS, Shore instead focused on "the psychological factors"—her maternal feelings towards her son, and her desire to protect his privacy.

In one sense, Dr. Whaley concluded, the present charges may ultimately prove beneficial for Shore, as they have forced her to address her longstanding depression. On the other hand, he argued that if she is imprisoned, her therapy would be interrupted, and her progress substantially impaired.

## 2. The Government's Objections to a Departure

The government mounted a number of challenges to a departure under § 5K2.13. First, it suggested that Shore's suicide attempt was contrived, occurring as it did, shortly after her lawyer preserved the possibility of a downward departure on psychiatric grounds. The psychiatric professionals who treated Shore, however, dispute the government's characterization. Dr. Whaley took Shore's suicide attempt quite seriously when it occurred, as did the doctors at MGH and McLean, where she was involuntarily committed and ordered to have either a "sitter" (if one was available) or "restraints" at all times. Further, Shore's personal physician indicated that although "[Shore] insists she is no longer suicidal . . . I am not convinced."

The government's second rationale for opposing a downward departure was its conviction that Shore's abilities as a businesswoman are inconsistent with Dr. Whaley's psychological portrait. Again, I disagreed. As Dr. Whaley noted, Shore's business was not "rocket science." She ran a parking lot and a seasonal tour boat, and she had done both for a long time. To Dr. Whaley, the facts suggested that Shore was chaotic and disorganized. He observed, "[i]n spite of appearing confident on the outside, inside she's been significantly overwhelmed."

Finally, the government argued that there was nothing unusual about Shore's circumstances or her mental condition. It

noted that many defendants are depressed, have bad judgment, and lead troubling or troubled lives. Such conditions, it averred, occur too commonly to be considered "diminished capacity" under 5K2.13. I appreciated the government's concerns—and, in fact, I shared them. Mental health issues are difficult to address consistently and accurately at sentencing, particularly in light of the significant resource disparities among defendants: Shore has the resources to seek expert counseling and to retain a doctor to identify her condition and testify on her behalf; many equally troubled defendants cannot afford such help. This unfortunate socioeconomic fact does not, however, justify ignoring Shore's evident and debilitating psychiatric problems.

### 3. *Jurisprudential Support for a Departure*

Shore's motion for a downward departure is further supported by the fact that Shore's mental condition, as described by Dr. Whaley, squarely fits the standard applied by several other courts in invoking the diminished capacity guideline.

For example, in *United States v. Herbert,* 902 F.Supp. 827 (N.D.Ill.1995), the court departed downward under circumstances similar to those in the case at bar. The defendant in *Herbert* pled guilty to a two count information charging her with embezzlement and tax fraud in violation of 18 U.S.C. § 664 and 26 U.S.C. § 7203. As in the case at bar, the alleged scheme was relatively complicated, and the sentencing guideline range was 12–18 months.

The court found that Herbert's psychological problems caused a "depressed state prompting [her] to question her own worth, make poor decisions, and then offer excuses to compensate for her shortcomings." *Id.* at 829. According to the testifying psychiatrist, Herbert's mental impairment affected her at the time of the offense and contributed to its commission.[23]

The *Herbert* court's analysis is instructive. The judge notes that the case law does not limit the types of mental disorders encompassed by § 5K2.13. *Id.* at 830. For example, there is no disqualification of depression, nor exclusion for borderline personalities. Nor does the *Herbert* court consider it dispositive that the defendant functioned normally at times. *Id.* Instead, the court suggests that although cases involving defendants with intermittent mental impairment may be more difficult to evaluate, a court's responsibility is clear: It must simply "ensure that the offense occurred during a period of mental impairment and that the conduct was actually the product of reduced mental capacity ." *Id.* at 830. The goal in such cases, put simply, is to identify defendants "who are less culpable because their actions were rooted in their psychiatric problems." *Id. Accord United States v. Apple,* 915 F.2d 899, 903 n. 12 (4th Cir.1990) *appealed after remand,* 962 F.2d 335 (4th Cir.1992) (noting that the district court departed under § 5K2.13 based on one defendant's chronic depression and battered wife status); *United States v. Weddle,* 30 F.3d 532 (4th Cir.1994) (upholding departure under § 5K2.13 as not "clearly erroneous," where the district court found that the behavior of the defendant was non-violent, attributable to a depressive

---

**23.** *Cf. United States v. Frazier,* 979 F.2d 1227, 1229–30 (7th Cir.1992) (reversing and remanding a sentencing departure under § 5K2.13, because the trial court erred in failing adequately to determine whether the defendant's depression contributed to the offense at bar, and in failing to consider the structure of the Guidelines in determining the extent of departure).

episode and highly unlikely to be repeated.)[24]

## C. *Extent of Departure*

The Guidelines call for a departure that reflects the "extent to which the reduced mental capacity contributed to the commission of the offense." § 5K2.13. I departed four levels, from level 12 to level 8, for the following reasons:

Three guidelines are listed as appropriate for sentencing under 26 U.S.C. § 7212(a): (1) obstructing or impeding an officer, which is a base level 6 offense; § 2A2.4; (2) obstruction of justice, which is a base level 12 offense; 2J1.2; and (3) tax evasion, which is a level 12 offense under the circumstances of this case; § 2T1.1. I agreed in general that 2T1.4 is most applicable here, because Shore's action caused a net tax loss. Nevertheless, I also find that Shore's psychological state warrants some consideration of the other guidelines, in light of Shore's unusual motive for her actions.

Dr. Whaley suggested Shore was not driven by financial motives, as is usual in most tax evasion cases, but instead by her impaired view of her family obligations. Shore misrepresented her assets and income not for financial gain, but out of a maternal (if misplaced) impulse to protect her son. Further, after the civil audit

began, Shore paid off the entire amount of the loss, and after her indictment, she pled expeditiously to the charges and agreed to a substantial fine of $30,000. Thus, although the analogy to a less serious obstruction offense may not be perfect, it provides a template for the departure.

In addition, a departure to a level 8 will enable Shore to continue her therapy. The guidelines provide for departures in zone C, for example, where such a departure is necessary to accomplish a specific treatment purpose. Based on Dr. Whaley's testimony, such is plainly the case here.[25]

For all of the above reasons, I sentenced Shore to two years probation, four months of which are to be spent in home detention with electronic monitoring, and to a fine of $30,000.

**SO ORDERED.**

---

24. To be sure, some courts have refused to depart downward under like circumstances. A few of these decisions rely on the stricter, pre-*McBroom* standard, which governed sentencing decisions prior to the amendments of 1998. *E.g. United States v. Withers*, 100 F.3d 1142, 1147–48 (4th Cir.1996). Additionally, in many of the cases, the court of appeals simply upholds the district court's denial of a departure as not "clearly erroneous." None of these decisions dictates the outcome here, however: As application of the clearly-erroneous standard should make clear, a trial judge's decision to invoke or reject § 5K2.13 is and should be tailored to the specific facts of the case at bar.

25. I recognized that U.S.S.G. § 5C1.2 (comment.) n. 6, refers to a departure effected by using a longer period of community confinement then is authorized for the purposes of accomplishing a particular treatment objective, whereas, in this situation, I have departed to another level to accomplish a similar end.