**UNITED STATES of America, Plaintiff,**

v.

**Jacob PALLOWICK, Defendant.**

**No. 03–CR–133.**

United States District Court, E.D. Wisconsin.

April 1, 2005.

Gregory Haanstad, Milwaukee, WI, for Plaintiff.

Brian Mullins, for Defendant.

## *STATEMENT OF REASONS MEMORANDUM*

ADELMAN, District Judge.

Defendant Jacob Pallowick pled guilty to six armed bank robberies. A pre-sentence report ("PSR") was prepared, which indicated that defendant's offense level was 27[1] and his criminal history category I, producing an imprisonment range of 70–87 months under the sentencing guidelines. Defendant moved for a downward departure based on diminished mental capacity, U.S.S.G. § 5K2.13, and vulnerability to abuse in prison, *Koon v. United States*, 518 U.S. 81, 112, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). He relied on a psychological evaluation and report from Dr. Bronson Levin, a clinical and forensic psychologist. The government opposed the motion and countered with its own report from Dr. John Pankiewicz.

However, prior to sentencing the Supreme Court issued its decision in *United States v. Booker*, —— U.S. ——, 125 S.Ct.

---

1. The base offense level was 20, U.S.S.G. § 2B3.1(a), plus 2 because the property of a financial institution was taken, § 2B3.1(b)(1), plus 3 because defendant possessed a "dangerous weapon," § 2B3.1(B)(2)(E), plus 5 based on the multi-count adjustment under § 3D1.4, and minus 3 for acceptance of responsibility, § 3E1.1.

738, 160 L.Ed.2d 621 (2005), which effectively made the guidelines advisory only. Defendant then argued that the factors set forth in his motion supported a non-guideline sentence below the advisory range. The government argued for a guideline term.

Upon consideration of the evidence and the arguments of counsel I decided to impose a non-guideline sentence. In this memorandum I set forth my reasons.

## I. BACKGROUND

At first blush, it might appear that a defendant guilty of six armed bank robberies who sought a sentence below a modest guideline range was pushing his luck. However, the facts of this case were highly unusual, and the sentencing decision was a very difficult one.

Defendant has a long history of mental illness, which runs in his family. His mother suffers from depression, for which she takes anti-depressants. His maternal grandmother and aunt had anxiety disorders, another aunt had clinical depression, and his half-brother takes medication for depression. As a child, defendant was withdrawn and spent most of his time playing alone in his room. These loner qualities became more pronounced in middle school, as the symptoms of an anxiety disorder emerged. He began to worry excessively about vague apprehensions of things going wrong, with strain and tension in his chest and "gut." He would get sweaty, shake, have trouble breathing and feel nauseous. During his high school years defendant developed a second emotional disorder, major depression, characterized by loss of energy and motivation, severe lack of confidence, and social withdrawal. At that point, in addition to sporadic anxiety attacks, he also felt near constant depression.

Defendant did poorly in high school, finishing in the bottom 25% of his class (and completed school only at the strict prodding of his step-father), despite the fact that his IQ tested in the superior range. Defendant enrolled at the University of Wisconsin–Milwaukee, but failed all of his classes, accumulating large student loan debts in the process. He then went through a series of jobs but was never able to hold one due to the symptoms of his mental illness. "Each new failure increased his depression and reinforced the belief that he was so afflicted that he would never succeed." (Dr. Levin's Report at 3.)

Defendant began drinking alcohol and smoking marijuana as a method of coping with his mental illness (as had his mother before she entered treatment). He stated that his substance abuse shifted the focus of his thinking from the troubling thoughts and feelings to the feeling of intoxication.

In 2002, defendant moved into an apartment with several acquaintances. However, the thought of being unable to afford the $325 monthly rent began to consume him. Defendant withdrew even further, and his family members reported that he refused to answer his phone or the door. In the fall of 2002, he suffered a severe panic attack and was taken to the emergency room. He was provided with medication but found that it did not relieve his symptoms. He sought treatment at the Milwaukee County Mental Health Complex ("MCMHC") because he had no insurance and received medication for depression. However, the medications were inadequate. He returned to the MCMHC on a few occasions but soon found that he was unable to motivate himself to do even that.

At that point,

Out of work, and unable to motivate himself to find work which he knew he could not handle ("I couldn't even go to a job interview and ask for an applica-

tion. I was dead to the world."), Mr. Pallowick worried how he would pay his rent. His major concerns were letting down his roommates and his parents finding out that he was a failure. The worry became profoundly all-consuming, seeming to be "worse than death." It became imperative to end the anguish ("It was unbearable. I felt like my head was going to pop from the pressure. It kept building. There was no way around it at all.") The thought of getting money from a bank came to him one day ("There was no other way I could think of to *live*.") and "instantly the anxiety got better."

(Dr. Levin's Report at 4.)

Defendant proceeded to commit six bank robberies between January and June 2003. His method was much the same in all of the crimes. He would enter the bank, approach the teller and submit a withdrawal slip. When the teller would question the account number on the slip, defendant would present a note or card indicating that he had a bomb and wanted money. Defendant actually had no bomb; rather, he carried a nylon or canvas bag containing some wires he had taped to a computer chip. No one was harmed during any of the robberies, and defendant made no direct threats to harm anyone. During several of the later robberies, defendant tried to disguise himself, wearing a hat and painting an acrylic scar on his face.

Defendant was eventually caught due to his inherent politeness. As he was leaving the bank following the last robbery, defendant's bag swept some deposit envelopes onto the floor. Defendant picked them up and returned them to the counter. Fingerprint tests led the police to defendant, and a search of his apartment pursuant to a warrant uncovered various materials used in the robberies. Defendant was arrested and quickly confessed. He told the

officers: "I am very sorry about scaring the tellers .... I beg for help. I have not been a whole person for many years. I cannot keep going with so much sadness and despair in my soul. I thank the officers who spent the time going over just what I have done." (Def. Stat. at 1.)

After his arraignment, defendant was released to complete an intensive in-patient program at Rogers Memorial Hospital, where new medications, Effexor (an anti-depressant) and Seroquel (an anti-psychotropic tranquilizer), were started. Following his discharge, he began counseling and continued with his medication regime.

Defendant and his family soon noticed a change in his condition. His anxiety and depression were relieved, and he was able to socialize with others. In May 2004 he obtained employment at a TV Repair shop, which he held until the shop closed in December 2004. He then got another job at a TV repair shop, which he held up to the time of sentencing. He did well on pre-trial supervision and committed no new offenses during the nearly two years the matter was pending.

By the time the case reached the sentencing stage, defendant was clearly a different person. Unable to eat when suffering the severe effects of his condition, defendant gained more than 50 pounds. He also displayed remarkable insight into his condition during his sentencing allocution. He appeared to be the gentle, meek person described in the records.

Therefore, I had to in imposing sentence reconcile the serious nature of the crimes with the unusual circumstances surrounding their commission.

## II. DISCUSSION

### A. Sentencing Procedure

Following *Booker*, I follow a three-step sentencing process. First, I determine the

applicable advisory guideline range. As noted, in the present case the range was 70–87 months. Second, I determine whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply. Finally, I determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). I can impose a sentence within the applicable guideline range (after any clearly applicable departures) if that is consistent with my consideration of the § 3553(a) factors, or impose a non-guideline sentence if that is justified by the § 3553(a) factors. I need not definitively resolve any departure issues if I decide to impose a non-guideline sentence. *See United States v. Smith,* 359 F.Supp.2d 771, 772–73 (E.D.Wis.2005) (citing *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005)).

In the present case, defendant moved for a downward departure based on his diminished mental capacity and vulnerability to abuse in prison. However, this was before *Booker* made the guidelines advisory. At sentencing, defendant presented his arguments in terms of the § 3553(a) factors and asked for a sentence below the advisory range. Consistent with his argument and because I concluded that a non-guideline sentence was appropriate, I made no formal ruling on the departure motion.

## B. Analysis

In imposing sentence, I have to consider the factors set forth in § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

After considering these factors, my task is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a); *United States v. Galvez–Barrios,* 355 F.Supp.2d 958, 960 (E.D.Wis. 2005).

I typically group the § 3553(a) factors into three categories: the nature of the offense, the history of the defendant, and the needs of the public and any victims. I analyze each category and in so doing consider the specific statutory factors under § 3553(a), including the advisory guidelines. *United States v. Ranum,* 353 F.Supp.2d 984, 989 (E.D.Wis.2005).

### 1. Nature of Offense

There can be no doubt that armed bank robbery is a very serious offense, and in this case defendant committed six of them over a period of six months. He planned the crimes, constructing a fake bomb and disguising himself. He also practiced writing robbery notes.

However, despite the number of offenses, their nature was on the mitigated side. Defendant was not actually armed and no one was hurt. Defendant made no direct threats to harm anyone and considered doing so "unacceptable." The PSR reported that the victim tellers did not suffer any significant or lasting trauma. The amounts taken at each of the robberies was not that large, and the total loss was less than $15,000.

## 2. Defendant's Character

Defendant was 28 years old at the time of sentencing. Aside from a burglary offense committed just before the string of robberies (on which he was awaiting sentence) he had no criminal record. As noted, he had significant substance abuse and mental health problems, which he made an effort to address. His employment history was sketchy, but that also appeared to be a byproduct of the mental illness. Since entering treatment, he was able to keep a job.

According to those who know defendant, these crimes were certainly out of character. At and prior to sentencing, I received statements from numerous friends and family members stating that these offenses are not who defendant is, and the record supported their contentions.

## 3. Needs of Public

So long as he remains in treatment and taking medication, defendant is not dangerous or likely to re-offend. He remained crime free since he committed these offenses following his entry into treatment. However, there was a need to impose a penalty sufficient to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment. The victim banks were owed $14,546.95 in restitution.

## 4. Sentence

The guidelines called for a term of 70–87 months. For two reasons, I concluded that this range was somewhat greater than necessary.

### a. Mental Illness

First, I believed that defendant's mental illness played a major role in the offenses and that his success in treatment made him less likely to re-offend. As indicated, I did not consider this as a departure under U.S.S.G. § 5K2.13; nevertheless, the cases considering that provision were helpful in analyzing the issue.

It was undisputed that defendant was suffering from severe mental illnesses—major depressive disorder and anxiety disorder—at and around the time he committed these offenses. Both experts agreed on that. The question was whether they contributed to the commission of the offenses and whether I should consider them in mitigation of the punishment.

Defendant did not argue that he could not tell right from wrong. Rather, he argued that he lacked the ability to control behavior he knew was wrongful. As Dr. Levin noted:

The police reports indicate that Mr. Pallowick took steps in the latter robberies to disguise his identity, showing a recognition that what he was doing was wrong. He also told the police he recalled feeling it was wrong to rob banks and thought that he "did not want to do this but eventually gave in and said to himself, 'I have to.'" Mr. Pallowick does have a conscience and was raised with good values, so he somehow [had] to overcome his moral training to engage in criminal acts. Upon interview with me, Mr. Pallowick described being in a depersonalized state, not caused by intoxication, during the robberies, "like watching somebody else and not doing it

myself, not thinking, just doing it. It didn't seem like my idea ... It was like sleepwalking." There were moments when it started to seem real, causing him to leave the bank. Then the anxiety would return, he would go back into the depersonalized state, and could again proceed with the robbery.... He reports knowing that he was not going to hurt anyone ("That would have been unacceptable.") and not thinking about getting caught and making his life worse ("I was to the point where I didn't care about what happened to me anymore. It couldn't possibly feel worse.").

(Dr. Levin's Report at 4.) Dr. Levin concluded that defendant's mental illness

compromised his ability to think and to process information clearly, and which dictated his choices and motivations. Were it not for the severity of these disorders, he would not have considered such an extreme method of solving his financial problems. It is not unusual for a person with a criminal personality structure to think of stealing to obtain money. It was highly unusual for this non-aggressive man to threaten with a bomb (even though it was a fake one). His decision to do so arose from intense symptoms of emotional illness.

(*Id.* at 5.) Defendant's current therapist, Antoinette Stout, also reported that if defendant had been properly medicated "this would not have happened." (*Id.*)

Dr. Pankiewicz agreed that defendant had a severe mental illness but, for several reasons, disagreed that any reduced mental capacity contributed to the crimes.

First, Dr. Pankiewicz stated that depressive disorder and anxiety disorder are not usually associated with criminal activity, and people with these conditions do not usually have an impaired understanding of right and wrong.

This may be true in general, but I had to consider this specific case. Further,

courts regularly have held that depression and anxiety may cause a substantially reduced mental capacity, supporting mitigation of punishment for crime. *See United States v. Shore,* 143 F.Supp.2d 74, 83–84 (D.Mass.2001) (collecting cases); *see also United States v. Robbins,* No. 98–4265, 1999 WL 95531, *1, 1999 U.S.App. LEXIS 3326, at *3 (4th Cir. Feb. 17, 1999); *United States v. Woodworth,* 5 F.Supp.2d 644, 647–48 (N.D.Ind.1998); *United States v. Brown,* No. 96–CR–451, 1997 WL 786643, *5, 1997 U.S. Dist. LEXIS 20258, at *15 (N.D.Ill.1997); *United States v. Herbert,* 902 F.Supp. 827, 829 (N.D.Ill.1995). The focus of the inquiry is reduced mental capacity, not the cause—organic, behavioral, or both—of the reduction. *United States v. Cantu,* 12 F.3d 1506, 1512 (9th Cir.1993).

Second, Dr. Pankiewicz noted that defendant was using drugs and alcohol to relieve his symptoms, and the government noted that despite years of mental illness defendant committed no crimes prior to commencing such abuse. It was true that defendant self-medicated with these substances, but there was no evidence that their use *caused* his reduced mental capacity. Just as the fact that the mental illness pre-dated the substance abuse was not dispositive, as defendant suggested, neither was this fact. Dr. Pankiewicz noted that substance abuse can impair judgment, while medication would not have similar effects. However, there was no evidence to suggest that defendant was intoxicated at the time he committed any of these robberies.

Like many of the untreated mentally ill, defendant self-medicated with drugs and alcohol. But he did not commit these crimes because he was an alcoholic or drug addict. The fact that defendant was using drugs or alcohol around the same time as the offense did not disqualify him from

consideration of a non-guideline sentence. *See Cantu*, 12 F.3d at 1514–15; *see also United States v. Speight*, 726 F.Supp. 861, 868 (D.D.C.1989). Dr. Pankiewicz noted that defendant had the option to re-enter treatment at the MCMHC but instead chose to use drugs and alcohol. He also noted that even though defendant lacked the motivation to seek help for his depression defendant was able to buy drugs and alcohol. However, it is not uncommon for those with mental illnesses to refrain from seeking the help they need, instead turning to substance abuse. *See Shore*, 143 F.Supp.2d at 82; *Brown*, 1997 WL 786643, \*\*1–2, 1997 U.S. Dist. LEXIS 20258, at \*2–4.

Third, Dr. Pankiewicz stated that defendant, despite reports of suicidal ideation, was able to refrain from killing himself, mainly because of the effect that would have had on his mother. He also noted that defendant lacked the motivation to return to the MCMHC for treatment, yet was motivated to commit six bank robberies. However, courts have long recognized "that an individual's average or above-average mental capacity in one aspect of his or her affairs is not necessarily relevant to a determination about the individual's mental capacity in another aspect." *United States v. McBroom*, 124 F.3d 533, 550 (3d Cir.1997). The government also noted that defendant was able to control his behavior in other aspects: for example, he entered three other banks but left without robbing them; he was also able to refrain from hurting anyone during the robberies. However, there is no requirement that a defendant be completely out of control in order to receive consideration of his mental illness. As the court noted in *McBroom*, the fact that the defendant in that case was able to conduct a successful law practice did not necessarily mean that he was able to control the compulsions that led to his crimes. *Id.*

Fourth, Dr. Pankiewicz noted that "depersonalization" is a defense mechanism that individuals with anxiety often use to decrease their anxiety. He therefore concluded that defendant was probably not very anxious when he committed the crimes. From defendant's own description that appeared to be the case. However, that did not mean that he was not operating under the effects of his mental illness at the time he committed the crimes. The depersonalization was an effect of the mental illness. Further, the effects of that illness warped his ability to choose a proper course of action before he actually entered the banks. It was true that, as the government noted, defendant decided to rob banks rather than face the embarrassment of asking his family for money. However, this begged the question as to why defendant considered the choice as he did. It seemed to me that a person functioning normally would rather ask his mother for money than rob a bank.

Fifth, Dr. Pankiewicz noted that defendant's argument that he was unable to control his behavior would make more sense had he committed just one offense. Actually, the fact that defendant lost control several times seemed to me to strengthen his argument. A seriously diminished mental capacity is likely to manifest itself more than once. Further, this observation seemed to contradict Dr. Pankiewicz's earlier observation that defendant could control some behaviors and thus was not entitled to sentence consideration. These two disparate observations could not support the same conclusion. Ultimately, as the court noted in *McBroom*, a defendant need not be totally out of control to obtain sentence consideration.

Finally, Dr. Pankiewicz questioned the validity of the testing mentioned in Dr. Levin's report, which showed that defen-

dant was not aggressive and scored high on the depression scale. However, aside from a bald statement, he gave me no concrete reason to doubt that testing.

Thus, Dr. Pankiwicz's report did not convince me that defendant was not acting under a diminished mental capacity.

The most difficult aspect of this issue was reconciling defendant's symptoms, including the lack of motivation and social anxiety defendant experienced, with his ability to plan and carry out six robberies. His behavior was not impulsive.

The best explanation was provided by Dr. Levin, who noted that, as the pressure mounted, the thought of robbing a bank came to defendant and the anxiety got better. He felt that he did not want to do it, but eventually gave in and said to himself, "I have to." Then, he entered what Dr. Levin described as a "depersonalized state" to commit the crimes. In sum, I agreed with Dr. Levin that defendant's mental illness substantially contributed to the offenses.

Further, to the extent that defendant's crimes were a product of his mental illness, he took steps to deal with his problems. He completed in-patient treatment shortly after his arrest, enrolled in counseling and took his medication. The evidence showed that he has made a complete turn around noticed by his family. He was employed and had committed no new offenses. Dr. Levin believed he was a low risk of re-offending, and I agreed. I further concluded that sending defendant to prison for a lengthy period of time would not aid in his rehabilitation and might actually hinder the progress he made in counseling. *See* 18 U.S.C. § 3553(a)(2)(D).

### b. Mitigated Nature of Offenses

The second reason why I believed the guideline sentence to be somewhat greater than necessary was the mitigating and non-threatening nature of the offenses. As noted, defendant had no real weapon, made no direct threats, and considered harming anyone unacceptable. Unlike in the usual bank robbery case, the victim-tellers did not report substantial trauma. Thus, the reasons why lengthy incarceration is usually appropriate in armed bank robbery cases were not present. Further, defendant had a minimal record and no history of violence. His scores on Dr. Levin's tests revealed that he was not anti-social or aggressive. There was no need to protect the public for the period called for by the guidelines. Although it is impossible to fully describe in a written opinion, the person who sat before me at sentencing was not a threatening person.[2]

Taking all of these factors into account, I imposed a prison sentence of 46 months on each count to run concurrently. There is no perfect manner of translating observations under the statute into a numerical sentence. However, "[t]he advantage of having advisory guidelines is that judges can use guideline terminology to translate findings under § 3553(a) into a specific sentence." *Galvez–Barrios*, 355 F.Supp.2d at 964. In the present case, I, in effect, deducted 2 from the 3 level enhancement for use of a dangerous weapon as a proxy for my observation that defendant's offenses did not reflect that degree of dangerousness typically seen in armed bank robberies. I also, in effect, reduced the sentence by 2 additional levels to account for the contribution of the mental illness to the offenses. *Cf.* U.S.S.G. § 3B1.2(b).

I could not conclude that a reduction greater than that was warranted. Al-

---

**2.** I was unpersuaded by defendant's argument that he was likely to be abused in prison. I did not believe it appropriate to a give a discount to someone just because he did not fit the typical profile of a federal prison inmate.

though I accepted Dr. Levin's report, I believed that a greater reduction would produce unwarranted disparity. *See* 18 U.S.C. § 3553(a)(6). Many defendants facing financial problems succumb to the temptation to steal. In this case, I found that defendant's mental illness reduced his ability to resist that compulsion and rationally consider his options. But in light of the other statutory considerations, including the seriousness of the offenses, I concluded that a substantial prison term was necessary. In sum, I considered a sentence of 46 months sufficient but not greater than necessary to satisfy the purposes of punishment.

Therefore, I committed defendant to the custody of the Bureau of Prisons for 46 months on each count to run concurrently. I further ordered that he pay restitution in the amount of $14,546.95 to the victim banks. Upon release from prison, I ordered that he complete five years of supervised release, with various conditions, including drug and mental health treatment.